COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Coleman and
          Senior Judge Duff
Argued by teleconference


CHARLES JUSTIN UTZ, S/K/A CHARLES JUSTIN UTZ,
 A/K/A JUSTIN C. UTZ
                                        OPINION BY
v.    Record No. 1188-97-4       JUDGE CHARLES H. DUFF
                                      OCTOBER 20, 1998
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                Benjamin N. A. Kendrick, Judge

          Sean D. O'Malie (Leon S. Demsky; Pelton,
          Balland, Young, Demsky, Baskin &
          O'Malie, P.C., on brief), for appellant.

          Michael T. Judge, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee.


     Charles Justin Utz appeals his convictions for the second

degree murder of Jose Danilo-Alberto (the "victim") and for using

a firearm in the commission of that murder.  He contends the

evidence was insufficient as a matter of law to sustain the

convictions and that the trial judge erred in allowing expert

testimony of "street-gang" culture.  We disagree and affirm.

                                I.

                  SUFFICIENCY OF THE EVIDENCE

     "Self-defense is an affirmative defense which the accused

must prove by introducing sufficient evidence to raise a

reasonable doubt about his guilt."  Smith v. Commonwealth, 17 Va.

App. 68, 71, 435 S.E.2d 414, 416 (1993).  Whether the evidence

raises such a reasonable doubt is a question of fact that will

not be disturbed on appeal unless plainly wrong or unsupported by the evidence. See Yarborough v. Commonwealth, 217 Va. 971, 979, 234 S.E.2d 286, 292 (1977). Words alone, no matter how insulting, are not sufficient to justify assault. See Smith v. Commonwealth, 192 Va. 186, 189, 64 S.E.2d 761, 763 (1951); Roark v. Commonwealth, 182 Va. 244, 252, 28 S.E.2d 693, 696 (1944). The trier of fact may infer malice from the deliberate use of a deadly weapon. See Perricllia v. Commonwealth, 229 Va. 85, 91, 326 S.E.2d 679, 683 (1985); Doss v. Commonwealth, 23 Va. App. 679, 685–86, 479 S.E.2d 92, 96 (1996). Moreover, "evidence of flight may be considered as evidence of guilt along with other pertinent facts and circumstances." Hope v. Commonwealth, 10 Va. App. 381, 386, 392 S.E.2d 830, 833 (1990) (en banc).

"On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). So viewed, the evidence proved that appellant possessed a concealed weapon that he used to fatally shoot the victim in the forehead at close range. Saul Palma, nicknamed "Primo," was a friend of the victim. Palma testified that he and the victim, nicknamed "Snoopy," had been outside, at night, near an apartment complex when some "yelling" attracted the victim's attention. The victim had been drinking. The victim and appellant exchanged insults and argued as the victim crossed a bridge and walked toward

appellant.  Palma and one or two others followed the victim, who approached a group of approximately ten people in a parking lot.  Appellant and the victim stood face to face.  The victim "raised his hands as if he was going to fight."  Appellant "made a half turn" and fired a single shot at close range at the victim's head.  After firing, appellant said two or three times to Palma and Palma's friends, "you want more."  Palma stated that, as the victim approached, everyone with appellant "started walking away towards" their car.  Appellant, however, "stayed on the sidewalk" and did not move or turn away as the victim approached him.  After appellant shot the victim, he left in a car that was accompanied by another car.  Palma never saw a gun or other weapon in the victim's hands and, as far as he knew, nobody in the group that he was with made any gestures indicating that they possessed a weapon.

William Martinez was with the victim and Palma and corroborated much of Palma's testimony.  Martinez and Palma followed the victim toward the parking lot.  Martinez never saw the victim with a weapon, nor did he see a weapon near the victim's body after the shooting.

Frank Saffelle, Jr. testified that he operates a tow truck that regularly patrols the parking lot where the shooting occurred.  On the night of the murder, he towed a Ford Explorer from the parking lot to a storage lot a few miles away.  After towing the Explorer, Saffelle returned to the parking lot.  While

there, he heard "words [being] exchanged," then he heard a gunshot.  Saffelle saw a car leave "with the lights out like in a real fast manner of leaving . . . immediately after the shot went off."

Shortly after the shooting, Officer James Wasem was told that the shooting suspects may have been "potentially involved in a tow dispute," so he proceeded to Saffelle's storage lot.  About ninety minutes after the shooting, a car containing five males arrived at the lot.  Appellant was one of the five occupants who were taken into custody.

Officer Andrew Baciocco arrived at the crime scene to recover and document any evidence.  Baciocco testified that no weapons were found at or around the crime scene.

Officer Noel Hanrahan interviewed appellant following his arrest.  After concluding a taped interview, appellant asked Hanrahan how the police caught him.  Hanrahan testified:

> He asked if we had followed the car that he was stopped in along with several others over by the tow company lot, if we had followed him from the apartment house.  And I told him, no, that we had staked out Brownie's Ford Explorer at the tow lot.  He put his head down, started shaking it back and forth, and said we'd never would have gotten him if he hadn't gone there.

Numerous friends of appellant who were present at the scene testified.  Although they testified, contrary to the testimony of Palma and Martinez, that the victim kept a hand hidden under his shirt, none of those witnesses saw the victim brandish a weapon.

Appellant testified that the victim approached him, cursing. When the victim asked appellant "are you ready to die now, puto?," appellant said he "turned around and shot the gun." Appellant said he "thought he was going to die." On cross-examination, appellant testified that "[w]hen he was right behind me, I was looking out the corner of my eye, and when he said the last thing, I just turned and went like that. Boom." Appellant stated that the victim appeared to have a weapon because he had a "bulge" under his shirt.

The fact finder believed the Commonwealth's evidence and rejected the evidence presented by appellant, including his theory of self-defense. "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of second degree murder and the attendant firearm charge.

II.

A.  EVIDENCE OF GANG AFFILIATION AND CULTURE

On December 4, 1996, the trial court heard argument on a motion in limine concerning the Commonwealth's intent to introduce expert testimony from Detective Paul Kozich about the characteristics and culture of street gangs and, particularly,

about the gangs of which the victim and appellant were respective members.  Appellant argued that such testimony was not probative of the ultimate issue in the case, namely, whether he acted in self-defense when he shot the victim, and, if probative, it was overly prejudicial.  The Commonwealth asserted that the proposed testimony would be relevant to rebut appellant's self-defense claim and to show that appellant had a motive, other than self-defense, for shooting the victim.  The trial court ruled that the testimony was "relevant to both the Commonwealth's case, their theory of their case, and to the defendant's theory of self-defense."  However, the trial court also ruled that "[t]here should be limits. . . .  I think you have to limit it to the areas that you were referring to today in your motions."  In response to defense counsel's request that he "reconsider at a later point based on any authority that we may be able to come up with," the trial judge replied, "You can always do that."

"Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." Ragland v. Commonwealth, 16 Va. App. 913, 918, 434 S.E.2d 675, 678 (1993).

> [W]hen relevant evidence is offered which may
> be inflammatory . . . its relevancy "must be
> weighed against the tendency of the evidence
> to produce passion and prejudice out of
> proportion to its probative value."  The

responsibility for balancing these competing considerations is largely within the sound discretion of the trial judge. And a trial court's discretionary ruling will not be disturbed upon appeal absent a clear abuse of discretion.

Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986) (citations omitted).

Although motive is not a necessary element of murder, "'it is relevant and often most persuasive upon the question of the actor's intent.'" Archie v. Commonwealth, 14 Va. App. 684, 690, 420 S.E.2d 718, 722 (1992) (quoting Epperly v. Commonwealth, 224 Va. 214, 232, 294 S.E.2d 882, 892-93 (1982)). See also King v. Commonwealth, 243 Va. 353, 367, 416 S.E.2d 669, 677 (1992).

There is little Virginia case law addressing the admissibility of evidence of gang membership. In Payne v. Commonwealth, 233 Va. 460, 357 S.E.2d 500 (1987), the defendant was convicted of murdering an inmate with whom he was incarcerated. On appeal, Payne alleged that the trial court erroneously admitted "testimony from a fellow inmate that defendant wished to be a member of the 'Pagans' motorcycle group, which apparently had an active local chapter within the correctional facility." Id. at 465, 357 S.E.2d at 503. The fellow inmate testified that Payne told him that he needed to prove himself in order to become a member of the "group" and that

he would "'automatically become a Pagan' when he became a 'killer.'" Id. Finding the evidence admissible, the Supreme Court held:

> Even though the prosecution is not required to prove motive, evidence of motive is relevant to establish a defendant's intent. According to the evidence, the main reason that defendant killed the victim was because the victim may have "snitched" on defendant, who had planned to escape from the facility, and because the victim had reneged on a drug deal in which defendant had paid the victim $500 cash to procure drugs for him. An additional motive, according to the evidence, was defendant's desire to be feared as a killer in order to join the local chapter of

the "Pagans." Manifestly, this evidence was relevant and properly admissible.

Id. at 465-66, 357 S.E.2d at 503.

Although gang membership alone is not evidence of a defendant's prior bad conduct, a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior. Therefore, we analyze the admissibility of such evidence under the prior bad act standard. Evidence of prior bad conduct is not admissible to prove that the defendant is a person of bad character and more likely to commit the offense charged; however, it is admissible in certain situations. As with all evidence deemed relevant, before it can be admitted, the trial judge must balance its relevance against the resultant prejudice.

> "Evidence of other independent acts of an accused is inadmissible if relevant only to show a probability that the accused committed the crime for which he is on trial because he is a person of bad or criminal character." However, such evidence is admissible when it is "relevant to an issue or element in the present case." "[I]f such evidence tends to prove any of the relevant facts of the offense charged and is otherwise admissible, it will not be excluded merely because it also shows him to be guilty of another crime."
> Accordingly, we have held that evidence of prior bad acts may be properly admitted
>
> > (1) to prove motive to commit the crime charged; (2) to establish guilty knowledge or to negate good faith; (3) to negate the possibility of mistake or accident; (4) to show the conduct and feeling

- 9 -

of the accused toward his victim, or to establish their prior relations; (5) to prove opportunity; (6) to prove identity of the accused as the one who committed the crime where the prior criminal acts are so distinctive as to indicate a modus operandi; or (7) to demonstrate a common scheme or plan where the other crime or crimes constitute a part of a general scheme of which the crime charged is a part.

"With respect to these exceptions, the test is whether 'the legitimate probative value outweighs the incidental prejudice to the accused.'"

Reynolds v. Commonwealth, 24 Va. App. 220, 223-24, 481 S.E.2d 479, 481 (1997) (citations omitted).  See also Guill v. Commonwealth, 255 Va. 134, 140-41, 495 S.E.2d 489, 492-93 (1998) (discussing and analyzing "intent" exception to rule; test for admission of evidence of other crimes requires a "causal relation or logical connection" between past conduct and charged offense to be admissible under that exception) (citation omitted).

While commonly recognizing that evidence identifying a defendant as a member of a gang may be prejudicial, since juries may associate such groups with criminal activity and improperly convict on the basis of inferences as to the defendant's character, many courts have held that such evidence may nevertheless be admissible if it is sufficiently relevant to a proper issue in the case, weighing this probative value against the danger of unfair prejudice.  Gang membership has frequently been found to be probative and admissible, for example, as evidence of a possible motive for the crime, particularly in homicide cases where the defendant and his victim are shown to have

been members of rival gangs; as an indication
of possible bias on the part of defense
witnesses who are shown to be members of the
defendant's gang . . . .  Courts holding that
such evidence should have been excluded in
the case at hand have generally held that it
had not been shown to be probative of the
issues presented, that the point it related
to was relatively minor, or that point could
have been made with other, less prejudicial
evidence.

John E. Theuman, Admissibility of Evidence of Accused's
Membership in Gang, 39 A.L.R.4th 775 (1985).  See also id. (Supp.
1997) (citing additional cases).

In United States v. Abel, 469 U.S. 45, 47 (1984), Ehle, a
government witness, implicated Abel in a robbery in which Ehle
was also involved.  Abel called Mills, an inmate, as a witness.
See id.  Mills, who was not involved in the robbery, testified
that Ehle told him that he "intended to implicate [Abel]
falsely."  Id.  In rebuttal, the government recalled Ehle, who
testified that he, Abel, and Mills were members of a secret
prison gang.  See id.  Although Abel did not testify, the Court
ruled that the government's witness could testify about the
gang's tenets and that such evidence was admissible to impeach
Mills and to show his bias.  See id. at 49.

Other jurisdictions addressing the admissibility of evidence
of gang membership or gang activity make a threshold
determination whether such evidence is relevant to an issue in
the case.[1]  If the evidence is deemed relevant, the trial court

_____

[1]Most of the cases cited in this discussion suggest that the
gang-related evidence was admitted in the prosecution's

- 11 -

must decide whether its admission constitutes unfair prejudice.[2]

---

case-in-chief.  In such cases, the prosecution was required to lay a proper foundation by closely linking the gang-related evidence to the charged offense.  Cf. Guill, 255 Va. at 140, 495 S.E.2d at 492 (requiring causal relation or logical connection).

[2]See, e.g., Siler v. State, 705 So. 2d 552, 556-59 (Ala. Crim. App. 1997) (admission of past gang-related activity and rivalry was directly relevant to show motive and state of mind; due to its direct relevance, it was not overly prejudicial); State v. Romero, 870 P.2d 1141, 1147-48 (Ariz. Ct. App. 1993) (evidence of defendant's gang affiliation established a link between the crime and gang rivalry and was relevant to establish motive; trial court properly balanced probative value with prejudice); People v. Williams, 940 P.2d 710, 738 (Cal. 1997) (in gang-related case, gang evidence is admissible if relevant to motive or identity, so long as probative value not outweighed by prejudicial effect), cert. denied, 118 S. Ct. 1169 (1998); State v. Taylor, 687 A.2d 489, 500 (Conn. 1996) (finding evidence of gang affiliation relevant and not overly prejudicial to establish motive for murder), cert. denied, 117 S. Ct. 2515 (1997); People v. Knox, 608 N.E.2d 659, 663 (Ill. Ct. App. 1993) (explaining that gang-related evidence "is only admissible where there is sufficient proof that gang membership or activity is related to the crime charged"; holding that gang-related evidence was sufficiently linked to offense and was, therefore, admissible to provide motive for otherwise inexplicable murder); State v. Toney, 862 P.2d 350, 352-53 (Kan. 1993) (evidence of defendant's gang membership and expert testimony about gang conduct was relevant and admissible in government's case-in-chief to show motive for murder); Hoops v. State, 681 So. 2d 521, 529-31 (Miss. 1996) (upholding admission of evidence of defendant's involvement in gang that had rivalry with victim's gang to show motive for otherwise unexplained assault; finding that probative value outweighed danger of unfair prejudice); Tinch v. State, 946 P.2d 1061, 1064-65 (Nev. 1997) (upholding admissibility of evidence of gang affiliation where it was relevant to charged offense and probative value was not substantially outweighed by danger of unfair prejudice; "conclud[ing] that the [gang-related] evidence was relevant to the gang enhancement charge and could show motive"); People v. Connally, 481 N.Y.S.2d 432, 433 (N.Y. App. Div. 1984) (limited evidence of gang affiliation was relevant and admissible to prove motive and intent); State v. Campbell, 901 P.2d 1050 (Wash. Ct. App. 1995) (holding that evidence of defendant's gang affiliation was sufficiently linked with crime and was probative to show motive and premeditation, supporting state's theory of case; trial judge carefully limited evidence so as to avoid undue prejudice).

- 12 -

Here, the gang-related evidence was relevant to establish a motive for the murder and was probative of appellant's intent. Moreover, the record fails to show that the trial judge abused his discretion in finding that its probative value was outweighed by any incidental prejudice.

### B. EXPERT TESTIMONY ABOUT GANGS

"Expert testimony is appropriate to assist triers of fact in those areas where a person of normal intelligence and experience cannot make a competent decision." Swiney v. Overby, 237 Va. 231, 233, 377 S.E.2d 372, 374 (1989). The expert testimony must be relevant, and the trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge and whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue. See Farley v. Commonwealth, 20 Va. App. 495, 498-99, 458 S.E.2d 310, 312 (1995). "The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion." Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992).

Despite our extensive body of law regarding expert witnesses, whether an expert can provide testimony about gang culture and characteristics is an issue of first impression in Virginia. Therefore, we look to other jurisdictions for guidance.

A witness qualifies as an expert if "because

> of his skill, training, or experience, he is
> better able to form a more accurate opinion
> as to the matter under consideration than is
> an ordinary person." . . . [S]pecialized
> formal training [i]s unnecessary, . . . [and]
> experience alone [can] qualify one as an
> expert, . . . . [A]s long as the testimony
> is based upon information of the "type
> reasonably relied upon by experts in the
> field," it would be proper to admit it.

People v. Ayala, 567 N.E.2d 450, 455 (Ill. Ct. App. 1990) (holding that police officer with two years experience investigating gang-related criminal activities "possessed a greater knowledge of gang activity than would be available to the average person") (citations omitted).

"An expert need not acquire his [or her] knowledge through personal experience" as long as he or she possesses "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." State v. Campbell, 901 P.2d 1050, 1056 (Wash. Ct. App. 1995) (allowing expert testimony of gang terminology, gang interactions with other gangs, and types of activities in which gangs involved to establish premeditation, intent and motive at murder trial). See also People v. Williams, 940 P.2d 710, 739 (Cal. 1997) (upholding qualification of police officers as gang experts and admission of their testimony regarding gang behavior and motives); People v. Gardeley, 927 P.2d 713, 720-21 (Cal. 1996) (subject matter of the culture and habits of criminal street-gangs was sufficiently beyond common experience that witness with special knowledge or matter in question may qualify as expert), cert. denied, 118

S. Ct. 148 (1997).

Detective Kozich had been a police officer since 1979. At the time of trial, he was "detailed to the ATF Gang Task Force in Northern Virginia." He received "over 300 hours of training involving drug gangs or drug investigations and much of that has to do with gang investigations." In addition, Kozich received "approximately 200 hours of gang-related training" conducted by "various experts from Los Angeles, New York, Chicago, DEA, FBI, [and] INS." Kozich explained that he teaches classes and conducts lectures about gangs for numerous law enforcement organizations and civic groups. He testified that, "on a national level, I get information bulletins from virtually all over the country."

> On a more regional level, [he is] a member of a group called MARGIN, which stands for Metro Area Regional Gang Investigative Network. That's a group of investigators from the Washington Metropolitan area. There are approximately 52 agencies which range from Baltimore down to Stafford County. And [they] meet once a month, and [they] exchange information on gangs because gangs very often cross jurisdictional boundaries.

Kozich has conducted surveillance of local gangs, and he regularly receives reports from the local police regarding gang activity. He explained that he was familiar with appellant's gang and with the victim's gang.

Kozich described the two kinds of gangs which exist in the area. According to Kozich, "[t]here is either a gain- or economic- or asset-type of gang or the other type would be a

turf-oriented gang."  Kozich was familiar with the gang of which appellant was a member, the Tiny Rascals Gang ("TRG"), and the gang of which the victim was a member, Mal Sal Latruca[3] ("MS"). Kozich characterized both gangs as "turf-oriented" gangs.  He explained:  "[T]he individuals that are involved in these gangs are not involved for the purpose of profit like a, for example, a drug gang would be.  These individuals are there often for self identity, and, . . . sometimes the gang becomes a sort of substitute family for the individual members."  Kozich further explained that, because a "turf-oriented" gang's "motive is not profit, very often . . . the leader is the person who is most notorious or the most violent or the person who has the gun at the time."

On cross-examination, Kozich agreed that the victim lived in the area where the shooting occurred and that appellant and his friends were likely on "turf" claimed by the MS gang, of which the victim was a member.  Kozich also agreed that when a gang member approaches someone with his hand concealed, "[i]t could mean that he's armed."

Based on Kozich's extensive experience with and knowledge of gangs, he was qualified to testify as an expert.  Because the subject matter was beyond the common knowledge and experience of ordinary jurors, the trial judge did not abuse his discretion in

_____

[3]In the transcript of the hearing on the motion in limine, the prosecutor referred to the victim's gang as "Mara Salva Chuka."

allowing Kozich to testify about gang culture in order to show motive and intent and to rebut appellant's claim of self-defense. Moreover, the evidence showed that the victim was a member of another gang that occupied the area where the shooting occurred. That evidence was beneficial to appellant and supported his theory that the victim was the aggressor, thus belying the prejudice that appellant claims he suffered.

> At trial, Kozich was asked to define a gang. He explained: The way we define a gang in Arlington County is when a group meets a certain criteria. And those -- that criteria is five or more people, they have a unique name, they display symbols, which is usually in the form of hand signs or tatoos or the things they use in graffiti, they claim some kind of turf, they associate on a regular basis, and most importantly they're involved in some sort of criminal or illegal activity.

Defense counsel objected, the jury was excused, and appellant moved for a mistrial. The trial judge refused to grant a mistrial but admonished counsel to "[c]lear that up" lest he "instruct them." After the jury returned, the prosecutor asked Kozich, "[I]s it fair to say that not everyone in a gang commits a crime?" Kozich agreed.

Appellant failed to argue on appeal that the trial judge erred in refusing to grant a mistrial. Instead, he contends Kozich's statement further prejudiced him. Appellant conceded in his brief that "the Trial Court gave a curative instruction," but he contends that "it is impossible to expect ordinary persons to completely erase what they have just heard." In a written

stipulation received by the jury, appellant admitted to a prior conviction for carrying a concealed weapon. Moreover, two of appellant's witnesses, Joy Nouanelady and Marcus Lee, admitted having prior convictions that were proper subjects of impeachment. Because of the prompt corrective action taken regarding Kozich's statement, and in light of the fact that the jury was aware of criminal convictions involving appellant and two of his witnesses, we find no additional, excessive prejudice requiring reversal.

Accordingly, the convictions appealed from are affirmed.

<u>Affirmed.</u>