COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Annunziata and Senior Judge Coleman
Argued at Richmond, Virginia


MICHAEL C. McCORMICK, II

                                        MEMORANDUM OPINION* BY
v.    Record No. 3058-01-2            JUDGE SAM W. COLEMAN III
                                            MAY 20, 2003
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Margaret P. Spencer, Judge

            Craig S. Cooley for appellant.

            Margaret W. Reed, Assistant Attorney General
            (Jerry W. Kilgore, Attorney General, on
            brief), for appellee.


     The trial court convicted Michael C. McCormick, II,

appellant, of malicious wounding and using a firearm in the

commission of a felony.  On appeal, McCormick contends the trial

court erred by (1) permitting firearms expert Wendy Gibson to

testify and give her opinion about the scarcity and availability

of Kahr brand firearms in the Richmond area and (2) limiting the

cross-examination of Commonwealth's witness Stacy Hicks concerning

the extent and frequency of her drug use.  Finding no error, we

affirm the trial court's judgment.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## Facts

Sasha Leadbetter was socializing with friends when they heard gunshots some distance away.  Moments later, they heard more gunshots which sounded closer.  The third set of gunshots was so close they "dropped down" as a precaution.  Leadbetter was shot in the head.  Her eyes were damaged and her injuries required surgery, including the removal of a portion of her left frontal brain lobe.

Earlier that evening, appellant had been with Stacy Hicks and Angela Piland at a nearby bar.  When they left the bar, a man approached them and asked for money.  Appellant refused to give the man money and said "[F]uck you, nigger, get a job." The man ran, and appellant chased him.  Hicks and Piland returned to Piland's apartment.

Raylonzo Blathers testified that at the date and location of the shooting he saw a white man walking down the side of the street shooting his gun across the street and saw a black man backing up across the street.  Blathers heard the white man, whom he identified as appellant, say, "I'm tired of you motherfuckers taking my money."  When the black man turned the corner, the white man got into a black truck with a camper shell, "sped" to the corner, stopped, and fired a shot down the street.

Robert Vaughn testified that on the same date and location he saw a black truck skid to a stop at the intersection where

- 2 -

the shooting occurred. Vaughn saw a man extend his arm out of the truck window and fire shots. After the man drove away, Vaughn "snuck" down the block and saw a girl lying wounded in the street.

After appellant and Hicks and Piland separated following their encounter with the panhandler, appellant went to Steven McNear's party. Appellant climbed over McNear's six-foot high fence in order to get to McNear's backyard. According to McNear, appellant was "jumping" around and appeared anxious. Appellant told McNear he had gotten into an argument with a man who had asked for money and had shot the man. McNear recalled that appellant carried a Kahr brand pistol. McNear testified appellant told him, in a later conversation, that none of what he previously had told McNear about the shooting was true and that he was only trying to shock McNear.

After leaving McNear's party, appellant went to Piland's apartment and yelled for her to let him inside. When neither Piland nor Hicks answered the door, appellant climbed in through a window. Hicks testified that appellant told them he was moving to Africa and said "he shot the man who asked us for some change in the stomach three times." Appellant said, "I made the nigger dance." When Hicks and Piland said they were going to call the police, appellant said he was just "joking." Appellant grabbed the phone from Hicks and broke it, and eventually left Piland's apartment.

- 3 -

The next day, Hicks noticed an article in the newspaper about Leadbetter being shot in the area where the encounter had occurred. When Hicks mentioned the article to appellant, appellant became "flush" and denied knowing anything about the shooting.

At trial, firearms expert Wendy Gibson concluded that based on the rifling characteristics on the cartridge casings found near the shooting the shots "probably" were fired from a Kahr firearm. Gibson testified that based on her experience with the sale of guns at local gun stores in the Richmond area, few Kahr pistols are sold there. She also explained that in the four offices of the statewide forensics laboratory, only five Kahr pistols had come through for examination. Gibson did not specify the time frame or total number of weapons included in the statewide database, but testified that the Richmond office alone examined approximately 1,500 to 2,000 firearms a year. Appellant had a permit to carry a concealed weapon and had a black Ford Ranger pickup truck registered in his name.

### Expert Testimony

"Where the admissibility of expert testimony is challenged on appeal, the standard of review is whether the trial court abused its discretion." Currie v. Commonwealth, 30 Va. App. 58, 64, 515 S.E.2d 335, 338 (1999). "Expert testimony is appropriate to assist triers of fact in those areas where a person of normal intelligence and experience cannot make a

- 4 -

competent decision." Utz v. Commonwealth, 28 Va. App. 411, 423, 505 S.E.2d 380, 386 (1998).  "The expert testimony must be relevant, and the trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge and whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue." Id.

Gibson, a forensic scientist in the field of firearm and tool mark identification, qualified, without objection, as an expert in the area of firearms.  Gibson testified that the rifling characteristics on the cartridge casings found in the street were consistent with and similar to those of a Kahr pistol.  Test results indicated that all of the cartridge casings collected at the scene were fired from the same weapon. Based on her experience and knowledge about gun sales in local gun shops, Gibson knew that few Kahr firearms were sold in the Richmond area, and so testified.  Gibson knew that the data recorded in the NIBIN system for firearms examined in forensic laboratories in Virginia, Maryland, and Washington, D.C., showed that only five of the 1,500 to 2,000 that were examined in the Richmond laboratory had been Kahr brand firearms.  The trial court allowed Gibson to testify as to "her familiarity in this area based on the information that she has received as a firearm expert, and that information includes the NIBIN information." Gibson's testimony was within her area of expertise, was not

- 5 -

within the range of the jury's common experience, was relevant, and assisted the trier of fact in understanding the evidence. See Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002). The trial court did not abuse its discretion in admitting this expert testimony.

### Cross-Examination Issue

"Limitation of cross-examination is a matter within the sound discretion of the trial court and is subject to review only for abuse of discretion." Naulty v. Commonwealth, 2 Va. App. 523, 529, 346 S.E.2d 540, 543 (1986). Once the right to cross-examine has been fairly and substantially exercised, the trial court may exercise its discretion to prevent the right from being abused. Maynard v. Commonwealth, 11 Va. App. 437, 444, 399 S.E.2d 635, 639 (1990) (en banc). "[T]he defendant's right to cross-examine witnesses does not extend to collateral and irrelevant matters. A witness cannot be impeached by evidence of a collateral fact which is not relevant to the issues of the trial, even though to some extent it has a bearing on the issues of credibility." Id.

At trial, appellant's counsel asked Hicks several questions about her drug use during the time frame surrounding the crime.[1]

---

[1] The following dialogue occurred:

> [DEFENSE COUNSEL:] Now, let me ask you this. Either before that date of July 21 or this discussion that you indicated that you had

or that you heard Mike have, had you used controlled substances?

[HICKS:]  Yes.

[DEFENSE COUNSEL:]  And how long had you used control [sic] substances?

[HICKS:]  About two months, two or three months.

[DEFENSE COUNSEL:]  And what were you using?

[HICKS:]  Heroin.

[DEFENSE COUNSEL:]  And how frequently were you using?

[COMMONWEALTH'S ATTORNEY]:  Judge, objection at this time.  Relevancy.  The question may be posed if she was using heroin at the time of the offense, but not anything else.

THE COURT:  Sustained.  You may ask her, her condition at the time this happened, but the fact she could have been using substances three months before or how often she was using the three months before are simply not relevant.  Let's narrow down the time.

[DEFENSE COUNSEL:]  On this date, what were you using?  How frequently?

[HICKS:]  Nothing.

[DEFENSE COUNSEL:]  Nothing this particular date.  You were an addict the day before but didn't use --

[COMMONWEALTH'S ATTORNEY]:  Judge, objection to --

[HICKS:]  I was not an addict.

THE COURT:  Sustained.

[DEFENSE COUNSEL:]  You were never an addict?

[HICKS:]  No, I was an addict later on, but it doesn't happen overnight.

[DEFENSE COUNSEL:]  So it didn't happen in two months, I take it?

[HICKS:]  No.

[COMMONWEALTH'S ATTORNEY]:  Judge, my continued objection.

THE COURT:  Sustained.

[DEFENSE COUNSEL:]  Had you used the day before?

[COMMONWEALTH'S ATTORNEY]:  Objection, again, to relevance.

THE COURT:  Sustained.

[DEFENSE COUNSEL:]  Judge, the impact of drugs over a period of time is certainly relevant --

THE COURT:  I've sustained the objection. Let's move on, counsel.  She said she was using nothing that day.

[DEFENSE COUNSEL:]  And you continued to use after that?

[COMMONWEALTH'S ATTORNEY]:  Judge --

THE COURT:  Sustained.

[DEFENSE COUNSEL:]  You made a statement subsequent to all of this, correct, to the police?

[HICKS:]  Yes.

[DEFENSE COUNSEL:]  Were you using heroin at that time?

THE COURT:  On the date she made the statement to the police?

[DEFENSE COUNSEL:]  That's correct.

- 8 -

Hicks testified that she had been using heroin for two or three months at the time of the crime.  When appellant's counsel asked how frequently Hicks was using the heroin, the Commonwealth's attorney objected on the basis of relevancy, and took the position that counsel could only ask about Hicks's drug use at the time of the crime, but not about her frequency of drug use months before the crime.  The court sustained the objection and ruled that, "You may ask her, her condition at the time this happened, but the fact she could have been using substances three months before or how often she was using [the substances] . . . are simply not relevant.  Let's narrow down the time."

---

THE COURT:  All right.  On the date you made the statement to the police, were you using heroin on that date?

[HICKS:]  Probably not.

[DEFENSE COUNSEL:]  Probably not?

[HICKS:]  I wouldn't imagine I would talk to the police when I was using heroin.

[DEFENSE COUNSEL:]  Why would you imagine that you wouldn't be using heroin when you were talking to the police?

[HICKS:]  Well, they could lock you up.

[DEFENSE COUNSEL:]  I see.  And your recollection of what you're telling these folks today is based in part on your discussions that you've described to us with Ms. Piland?

[HICKS:]  What I'm discussing today is what I heard and what I saw.

Hicks testified that she had not used heroin on the day of the crime.

Appellant's counsel was permitted to prove that Hicks had used heroin for two or three months prior to the shooting and to cross-examine Hicks about her drug use on the day of the shooting. We cannot say that the trial court abused its discretion by limiting the testimony about Hicks's drug use to the time frame of the day of the crime. Whether Hicks used drugs months before the crime and how frequently she used drugs months before the crime are collateral and of little or no relevance other than to portray her as a drug addict. No evidence was introduced or proffered that heroin use for two or three months prior to an event would prevent a person from perceiving or recalling events. The appellant sought to suggest by innuendo that the prior drug use rendered Hicks's testimony unworthy of belief. On the record, the trial court did not abuse its discretion by limiting the cross-examination of Hicks.

For these reasons, we affirm McCormick's convictions for malicious wounding and use of a firearm.

Affirmed.

Benton, J., dissenting.

I would hold that defense counsel was deprived of the opportunity to fully cross-examine the witness and that the record did not contain a factual basis to support the firearms expert's testimony about the popularity and scarcity of the handgun.

I.

"[A] primary interest secured by [the Sixth Amendment to the Constitution] is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418 (1965). "Cross-examination . . . [is] fundamental to the truth-finding process." Barrett v. Commonwealth, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986). In order to further these interests, "the cross-examiner is . . . permitted to delve into the witness' story to test the witness' perceptions and memory, [and] the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness." Davis v. Alaska, 415 U.S. 308, 316 (1974). "Although a trial [judge] may exercise discretion to see that the right of cross-examination is not abused, the discretion may be employed only after the right to cross-examine has been fairly and substantially exercised." Barrett, 231 Va. at 108, 341 S.E.2d at 194.

After testifying on direct examination about events that occurred a year earlier, Stacy Hicks testified on cross-examination as follows:

- 11 -

Q  Now, let me ask you this.  Either before that date of July 21 or this discussion that you indicated that you had or that you heard Mike have [after July 21], had you used controlled substances?

A  Yes.

Q  And how long had you used control substances?

A  About two months, two or three months.

Q  And what were you using?

A  Heroin.

Q  And how frequently were you using?

[PROSECUTOR]:  Judge, objection at this time.  Relevancy.  The question may be posed if she was using heroin at the time of the offense, but not anything else.

THE COURT:  Sustained.  You may ask her, her condition at the time this happened, but the fact she could have been using substances three months before or how often she was using the three months before are simply not relevant.  Let's narrow down the time.

            *    *    *    *    *    *    *

Q  Had you used the day before?

[PROSECUTOR]:  Objection, again, to relevance.

THE COURT:  Sustained.

[DEFENSE ATTORNEY]:  Judge, the impact of drugs over a period of time is certainly relevant --

THE COURT:  I've sustained the objection.  Let's move on, counsel.  She said she was using nothing that day.

Q  And you continued to use after that?

[PROSECUTOR]:  Judge --

THE COURT:  Sustained.

I would hold that the trial judge impermissibly narrowed trial counsel's ability to demonstrate by cross-examination that the witness' heroin use was substantial.  In determining the extent to credit the witness' ability to remember and perceive the events to which she testified, the jury was entitled to know the severity of the witness' heroin addiction.  Indeed, the significance of the witness' heroin addiction was sufficient for the trial judge to permit the prosecutor to ask the witness the following question on redirect:

Q  . . . [H]ow long have you been clean now?

[DEFENSE ATTORNEY]:  Objection to the relevance of that.

THE COURT:  Overruled.

A  Almost two months.

What the jury did not learn, however, as contained in the proffer of the witness' testimony, was that she had used heroin two to three times a week prior to July 21, 2000; that, although she denied using heroin on July 21, 2000, she used it every day after July 21, 2000 for almost a year; that she sometimes used five bags of heroin each day; and that she also used cocaine and marijuana.  This evidence was relevant because it bore on the jury's obligation to determine the credibility of the witness. The jury was entitled to consider this evidence in weighing the

- 13 -

value of the witness' testimony concerning her purported recollection and perception of the events.

Hicks, who was with Michael C. McCormick on the night of July 21, 2000 when he chased a man near the bar, testified that McCormick had a concealed weapon permit. Although she did not see McCormick with a weapon that night, she knew he often carried "a small, black handgun." Another witness, who was a former police officer and was familiar with McCormick's gun use, testified that when McCormick first received his gun permit he owned "a Glock .45 caliber but later possessed a shiny, chrome-plated "Kahr pistol, either .9 millimeter or .40 caliber."

The record establishes that the police did not recover the gun that fired the bullet that wounded Sasha Leadbetter. The evidence proved, however, that the police discovered six cartridge cases in the area of the shooting and recovered from the hospital the bullet that wounded Leadbetter.

On direct examination, Wendy Gibson, a firearms expert, testified that she examined the bullet that wounded Leadbetter and the six cartridge cases found near the area of the shooting. She testified as follows concerning the bullet:

> It is a caliber .9 millimeter Luger. It's a jacketed bullet. I was able to determine that it had been fired from a firearm that had six lands and grooves inclined to the right with a polygonal type

- 14 -

of rifling, which means the rifling in that firearm has been suaged into the firearm as opposed to being cut.

Q  Now, when you say polygonal, is that a unique characteristic, by any means?

A  It's a type of rifling that manufacturers choose to use, and there are a few that do use them.

In addition, Gibson testified that all the cartridges had been "fired in one firearm."  She also testified as follows concerning her examination of one of those cartridges:

Q  And based on those characteristics, what was your conclusion as to what type of gun fired that cartridge case?

A  In my certificate of analysis, I listed a Kahr firearm.

                *    *    *    *    *    *    *

We have a computer system in our laboratory called NIBIN.  It's similar to the system used for fingerprinting.  And in our system, we can put an image of a cartridge case in and we can compare them through electronic means to other cartridge cases trying to connect possible cartridge cases from crime scenes.

In this particular case, here I have an image of the . . . cartridge case on the right, and this is from a testfire from a Kahr K .9 pistol that had been in our laboratory.  This is a known testfire that we produce at our laboratory.  And during my examination, based on these characteristics when I conducted this search there were similar characteristics between the two, the [cartridge case] and the known Kahr pistol. This was part of what was able to bring me to the conclusion that the cartridge cases may have been fired in a Kahr pistol.

- 15 -

On cross-examination, however, Gibson testified as follows:

> Q  That's not the only type of pistol, brand of pistol, make of pistol that would also cause this same appearance, correct?
>
> A  There's a possibility, yes, that's correct.
>
> Q  In fact, while you picked out the name Kahr to put into your report, in fact, the . . . bullet that you found, I believe the actual language is firearms that produce class characteristics on the . . . bullet include but are not limited to pistols with the brand name Kahr chambered to fire caliber .9 millimeter Luger cartridges, correct?
>
> A  That is correct.
>
> Q  So there are other types of weapons, brands of weapons that also would give the very same appearance as this Exhibit 16, correct?
>
> A  There may be.  That's true.
>
> Q  And you can't exclude that?
>
> A  That's correct.
>
> Q  Indeed, you did not list that the items -- let me rephrase that.  Can you say with certainty that the . . . bullet . . . that was recovered came from the very same weapon that these cartridge casings were fired from?
>
> A  No, I cannot.

Indeed, the certificate of analysis contained the following conclusion about the bullet and the cartridges:

> Firearms that produce class characteristics like those present on the . . . cartridge cases and the . . . bullet include, but are not limited to, pistols with the brand name

- 16 -

Kahr chambered to fire caliber 9 mm Luger cartridges.

Despite the equivocal nature of this report and Gibson's testimony, the prosecutor sought to establish "how popular [the Kahr pistol] may be" on redirect examination of Gibson.  After the witness testified that she was "slightly familiar with it," the Commonwealth was permitted, over McCormick's objection, to ascertain the expert's personal view of the scarcity and popularity of the Kahr pistol.

Q  And what is your opinion as to it being a popular firearm or it being very scarce?

\*     \*     \*     \*     \*     \*     \*

A  Could you please repeat that.

Q  With regards to the Kahr pistol, brand name Kahr, you have been able to do some research -- well, in your training and experience, you've had access to documentation about brand names of guns, correct?

A  Correct.

Q  And you also, in your training and experiences, you have contact with the individuals who sell firearms in the area; is that correct?

A  Correct.

Q  And so you have knowledge about how popular the sale of a Kahr pistol is; is that right?

A  Personal knowledge, yes.

Q  Okay.  And what do you know, in terms of it being a popular gun, as in is it sold a lot relative to other brands or not?

- 17 -

> A  My personal experience at local gun
> stores is that there are few Kahr pistols
> sold in this local area.  And statistically
> from our laboratory, I know that we have
> statewide between our four offices, five
> Kahr pistols come into our laboratory for
> examination.

Expert testimony "cannot be speculative or founded upon assumptions that have an insufficient factual basis." Tittsworth v. Robinson, 252 Va. 151, 154, 475 S.E.2d 261, 263 (1996).  A review of portions of Gibson's proffered testimony, which was put in the record in support of the objection, establishes the lack of basis for her testimony concerning the popularity or scarcity of the Kahr pistol.

> Q  . . . . Can you tell the Judge or could
> you have told this jury how many Kahr
> pistols have been manufactured in the United
> States?
>
> A  No, sir, I cannot.
>
> *    *    *    *    *    *    *
>
> Q  There is no record keeping of movement of
> guns from one state to the other, legally
> possessed and purchased guns, correct?
>
> A  As far as I know, that's correct.
>
> Q  You do not know how many Kahr pistols are
> in the Commonwealth of Virginia?
>
> A  That's correct.
>
> Q  And you do not know how many Kahr pistols
> might be in the Richmond vicinity?
>
> A  That's correct, sir.
>
> Q  Not only don't you, you have no idea
> whether there's 10,000?  You have no idea?

- 18 -

A   That's correct, sir.

Q   All you can answer to is the number of Kahr pistols that have come through either for evaluation or some form of assessment by the office at which you work as a forensic scientist; is that correct?

A   Yes, sir.   That's correct.

I would hold that Gibson's redirect testimony concerning her personal knowledge of the popularity or scarcity of the Kahr pistol was inadmissible.  I would also hold that this error was not harmless.  The harm in this evidence comes from the effect the jury may have given to it in assessing the prosecutor's other arguments about this evidence -- that the "Kahr .9 millimeter [is] a rare gun"; that "they are so rare that in [the expert's] experience she knows of 5 out of 2000 that have come up in Richmond."  This evidence was used to provide a necessary link between McCormick, a gun the prosecutor alleged was rare, and the bullet removed from Leadbetter.

For these reasons, I would reverse the convictions and remand for a new trial.