COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Kelsey
Argued by teleconference


SHAWN ORLANDO HUBBARD

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2511-04-3          JUDGE JEAN HARRISON CLEMENTS
                                                       FEBRUARY 28, 2006

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                              Mosby G. Perrow, III, Judge

            Joseph A. Sanzone (Sanzone & Baker, P.C., on brief), for appellant.

            Leah A. Darron, Assistant Attorney General (Judith Williams
            Jagdmann, Attorney General, on brief), for appellee.


        Shawn Orlando Hubbard was convicted by a jury of malicious wounding, in violation of

Code § 18.2-51, and use of a firearm during the commission of a felony, in violation of

Code § 18.2-53.1. On appeal, he contends the trial court erred in admitting expert testimony

adduced by the Commonwealth on gang culture. For the reasons that follow, we affirm the trial

court's judgment and Hubbard's convictions.

        As the parties are fully conversant with the record in this case and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I.  BACKGROUND

"Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Slade v. Commonwealth, 43 Va. App. 61, 64, 596 S.E.2d 90, 92 (2004).

So viewed, the evidence established that, around 9:30 p.m. on December 22, 2003, three men in black clothing with red bandanas around their necks or faces approached Kevin Napier, who was standing with several other people on a poorly lit street corner in Lynchburg.  Upon reaching the group, one of the men, who was later identified as Chase Irvine, asked, "What's popping?" and indicated he was looking for Napier.  Following a brief verbal exchange with Napier, Irvine pulled out a gun and shot Napier in the stomach.  As Napier lay wounded on the ground, Irvine and one of the other men wearing a red bandana shot him repeatedly.  Napier identified Hubbard as the other man who shot him.

Interviewed later that night by police, Eric Jones, a bystander at the scene of the shooting, identified Irvine and Hubbard from photo lineups as two of the men who had approached Napier. He did not know the identity of the third man.

Executing search warrants, the police recovered black clothing and red bandanas from the homes of Irvine and Hubbard.  Upon his arrest, Hubbard denied being involved in or at the scene of the shooting.

At trial on July 1, 2004, Napier testified that he was a "Lieutenant" in a gang called the Crips.  He explained that a "Lieutenant" is a high-ranking member of the gang who "give[s] orders and call[s] shots."  Napier also testified that Hubbard and Irvine were members of a gang called the Bloods.  Asked why he thought Irvine was looking for him and shot him, Napier responded, "The only reason I can think of is I was a Crip."  On cross-examination, Napier denied being a drug user but conceded he had used drugs in the past.  He testified that the corner

on which he was standing when he got shot was known to be a drug-trafficking area, but he denied that he was there for the purpose of buying or selling drugs.

Jones testified that the red bandanas Hubbard and Irvine wore when they approached and shot Napier signified their membership in a gang called the Bloods. He also testified that members of the Bloods used the greeting, "What's popping?" and that he "heard somebody say where Blood at" when Hubbard and the two men were fleeing after the shooting.

Theorizing that Hubbard and Irvine shot Napier because he was in a rival gang, the Commonwealth sought to present the testimony of Investigator Randall Trent, who qualified as an expert on gang culture in Lynchburg. Hubbard objected to the admissibility of Trent's testimony, arguing that expert testimony on gangs would be prejudicial to him and was irrelevant because the shooting was drug-related rather than gang-related. Hubbard further argued at trial that the Commonwealth had presented no evidence that the shooting was gang-related and, consequently, had failed to lay an evidentiary foundation for gang-culture testimony. The trial court denied Hubbard's objection and admitted Trent's testimony.

Investigator Trent testified that the Crips and the Bloods were active, rival gangs in the area and that the rivalry between the two gangs sometimes resulted in violence. Specifically, he testified that "just being in the same place at the same time" could incite violence between the two gangs, "especially if at that moment the gang members [were] wearing their colors, displaying their allegiance to one gang or another." Trent further explained that one way members of the Bloods identified themselves as being members of that gang was by wearing red bandanas around their necks or heads.

Hubbard presented an alibi defense and theorized that the shooting in this case "was a drug transaction that went bad involving Mr. Jones and Mr. Napier." In so theorizing, he highlighted Napier's history of drug activity and the fact that the area where Napier was shot was known for

drug-trafficking. Testifying on his own behalf, Hubbard stated he had nothing to do with the shooting and that he was at home on the evening of the shooting except when he went with his girlfriend to pick up their son at his girlfriend's grandmother's house. Hubbard's girlfriend testified that Hubbard was with her the entire night, both at home and when they went together to her grandmother's house to get their son. Hubbard's mother and grandmother also testified that Hubbard was at home on the evening of the shooting, except when he and his girlfriend went to pick up their son from 9:00 p.m. to 12:00 a.m.

Called by the defense, Kenneth Slaughter, a bystander at the scene of the shooting, testified that Hubbard and Irvine did not shoot Napier. Rather, he testified, four "much bigger and taller" men from New York shot him.

Following its deliberations, the jury convicted Hubbard of malicious wounding and use of a firearm in the commission of a felony.

This appeal followed.

## II. ANALYSIS

Hubbard contends the trial court abused its discretion in admitting Investigator Trent's testimony on gang culture into evidence. Initially, Hubbard asserts the Commonwealth presented no evidence that he was a gang member or that the shooting was gang-related and, thus, failed to lay a proper foundation for the expert testimony on gang culture. He further asserts the testimony on gang culture was not probative of the essential issue whether he shot Napier. Thus, Hubbard argues, the evidence was not relevant to prove his culpability and merely served to prejudice him before the jury.[1] We disagree and find no abuse of discretion by the trial court.

---

[1] Hubbard does not challenge Investigator Trent's qualification as an expert witness. Nor does he claim, on appeal, that Trent's testimony regarding gang culture was inadmissible because it was within the ken of the jury. Accordingly, we will not address those issues.

It is well settled that "[t]he admission of expert testimony is committed to the sound discretion of the trial judge." Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992). Thus, we will not disturb such a decision absent an abuse of discretion. Id.

Where expert testimony on gang culture is elicited "in the prosecution's case-in-chief," the prosecution is "required to lay a proper foundation by closely linking the gang-related evidence to the charged offense." Utz v. Commonwealth, 28 Va. App. 411, 422 n.1, 505 S.E.2d 380, 385 n.1 (1998). Here, in overruling Hubbard's objection to the admissibility of Investigator Trent's testimony on gang culture, the trial court determined that the Commonwealth had laid a proper foundation for the admission of the testimony. The record supports that determination and contradicts Hubbard's assertion that the Commonwealth presented no evidence that he was a gang member or that the shooting was gang-related.

Charged with the burden of proving that Hubbard shot Napier, the Commonwealth theorized from the outset that the shooting was gang-related. In support of that theory, the prosecution presented evidence, prior to the adduction of Investigator Trent's expert testimony, that (1) Hubbard and Irvine were members of the Crips and were wearing red bandanas when they approached Napier on the night of the shooting; (2) Napier was a high-ranking member of the Bloods; (3) immediately prior to the shooting, Irvine greeted Napier and the others standing on the corner with a distinctive greeting used by the Bloods; and (4) the only reason Napier could discern for the shooting was his membership in the Crips gang. Viewed in the light most favorable to the Commonwealth, this evidence demonstrated that the victim and the alleged perpetrators of the shooting were affiliated with different gangs and that those affiliations may have been the catalyst for the shooting. Thus, it closely linked Trent's testimony regarding the rivalry between the Crips and Bloods and the propensity of that rivalry to be the cause of

- 5 -

violence between those gangs to the shooting of Napier. Accordingly, it provided a sufficient foundation for the admission of Trent's expert testimony on gang culture.

A proper foundation alone, however, is not enough. To be admissible, "expert testimony must be relevant." Id. at 423, 505 S.E.2d at 386. "'Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case.'" Id. (quoting Ragland v. Commonwealth, 16 Va. App. 913, 918, 434 S.E.2d 675, 678 (1993)).

Specifically addressing the admissibility of expert testimony regarding gang culture in Utz, we noted that gang-related evidence may "'be admissible if it is sufficiently relevant to a proper issue in the case.'" Id. at 421, 505 S.E.2d at 385 (quoting John E. Theuman, Admissibility of Evidence of Accused's Membership in Gang, 39 A.L.R.4th 775 (1985)). Such evidence, we further noted, "'has frequently been found to be probative and admissible, for example, as evidence of a possible motive for the crime . . . where the defendant and his victim are shown to have been members of rival gangs.'" Id. (quoting Theuman, supra).

Accordingly, we held in Utz that expert testimony of gang culture may be "relevant to establish a motive for the [charged crime]." Id. at 423, 505 S.E.2d at 386. Although motive "is not an element of any crime," it is "a circumstance tending to prove the guilt of the alleged perpetrator" and is, thus, "relevant and probative on the issue of identity of the criminal agent." Cantrell v. Commonwealth, 229 Va. 387, 397, 329 S.E.2d 22, 28-29 (1985); see also Brown v. Commonwealth, 238 Va. 213, 221, 381 S.E.2d 225, 230 (1989) ("[M]otive is the reason that induces the mind to desire [a certain] result.").

As Hubbard points out, the fundamental issue in this case was whether he shot Napier. As previously mentioned, the prosecution's theory in this case was that the victim, a high-ranking member of the Crips gang, was shot by two members of the rival Bloods gang. After presenting evidence that the victim and alleged perpetrators were members of the Crips and

- 6 -

Bloods, respectively, the Commonwealth adduced the testimony of Investigator Trent to explain the potential significance of those gang affiliations. With no specific reference to Hubbard, Irvine, or Napier, Trent explained that the Crips and Bloods were active, rival gangs in the area and that violence between members of the two gangs sometimes resulted from their "just being in the same place at the same time," particularly if the gang members were "wearing their colors, displaying their allegiance to one gang or another." Trent also explained that members of the Bloods gang wore red bandanas to show their allegiance to that gang. If given weight by the jury, this evidence had a logical tendency to prove that Hubbard had a motive for shooting Napier and may indeed have shot him. Hence, Trent's expert testimony on gang culture was relevant to establish a motive for the shooting and, thus, the identity of the criminal agent.

That conclusion, however, does not end our inquiry. We have recognized that the admission of expert testimony on gang culture may be prejudicial because it creates a risk the jury will improperly infer from that evidence that the defendant is "a person of bad character and more likely to commit the offense charged." Utz, 28 Va. App. at 420, 505 S.E.2d at 384. Thus, even where gang-related expert testimony is deemed relevant, because it may have an inflammatory effect upon the jury, "the trial judge must balance its relevance against the resultant prejudice." Id. "Relevant evidence may be excluded only if the prejudicial effect of the evidence outweighs its probative value." Goins v. Commonwealth, 251 Va. 442, 461, 470 S.E.2d 114, 127 (1996).

Here, Hubbard challenges only the admission of Investigator Trent's expert testimony on appeal. He does not object to the testimony of Napier or Jones regarding Hubbard's membership in the Bloods. Given that Trent's testimony merely explained the significance of Napier's and Jones's testimony regarding Hubbard's affiliation with the Bloods and was manifestly probative of the central issue in the case, we cannot say the trial court abused its discretion in finding that

the probative value of Trent's testimony was not outweighed by any incidental prejudice of that evidence.

Accordingly, we hold the trial court did not abuse its discretion in admitting the expert testimony of Investigator Trent on gang culture, and we affirm Hubbard's convictions.

<u>Affirmed.</u>