COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued by videoconference


TYREE COLEY, A/K/A
 TYREE MARCUS COLEY
                                                          MEMORANDUM OPINION[*] BY
v.       Record No. 2109-23-2                    JUDGE JEAN HARRISON CLEMENTS
                                                            SEPTEMBER 9, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Phillip L. Hairston, Judge Designate

Gregory R. Sheldon (Bain Sheldon, PLC, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


In a joint trial, a jury convicted Tyree Marcus Coley and Savonne Henderson[1] of first-degree

murder, attempted murder, using or attempting to use a firearm in the commission of murder, using

a firearm in the commission of attempted murder, discharging a firearm in a public place with

injury, and discharging of a firearm from a motor vehicle.

Before sentencing, the trial court heard argument on Coley's motion to set aside the verdict

and motion for a new trial.  Denying the motions, the trial court sentenced Coley to incarceration for

life for the first-degree murder conviction, suspending all but 25 years, plus 31 years combined on

---

[*] This opinion is not designated for publication.  See Code § 17.1-413(A).

[1] Savonne Henderson's appeal is before this Court.  Henderson v. Commonwealth,
No. 1649-23-2 (decided this day).

the other convictions for an active sentence of 56 years.[2]  The trial court noted Coley's "lack of remorse" and the egregious nature of the offenses as justification for deviating from the sentencing guidelines.

In his appeal, Coley contends that the trial court abused its discretion by ordering joinder over his objection that prejudice could result from the admission of Henderson's statements against him, by admitting evidence of gang affiliation as highly prejudicial, by admitting evidence of Henderson's jail call, which amounted to an implicit admission by Coley, by instructing the jury on the theory of concert of action, and by denying his request for a new trial based on the prosecutor's statements in closing argument.  Further, Coley challenges the sufficiency of the evidence as a matter of law proving that he was a principal in the second degree to the killing and present at the scene of the homicide and that either he or one of his co-actors[3] fired the shot that killed the child victim.  We find no merit in Coley's arguments and affirm the jury verdicts and the trial court's rulings.

## BACKGROUND[4]

On appeal, "[t]his Court reviews the facts in the light most favorable to the Commonwealth, the prevailing party" below.  *Carter v. Commonwealth*, 79 Va. App. 329, 334 (2023).  "We 'regard as true all credible evidence favorable to the Commonwealth and all

---

[2] We note that the sentencing summary in the final order incorrectly reflects Coley's sentence as life plus 31 years of imprisonment with 25 years suspended.  We remand the case to the trial court for the limited purpose of correcting the sentencing summary to state Coley's sentence as life plus 31 years of imprisonment and that all but 25 years of the life sentence was suspended.  *See* Code § 8.01-428(B).

[3] Rarmil Malick Coley-Pettiford, Ra'shard Marquis Jackson, and Mitchell Hudson were the other co-actors.  All three pleaded guilty in 2023; there were no appeals filed in this Court.

[4] Consideration of the issues raised requires unsealing portions of the record.  "To the extent that specific facts mentioned here are found in the sealed portions of the record, we unseal those portions only as to those specific facts."  *Thomas v. Commonwealth*, 82 Va. App. 80, 93 n.4 (2024) (en banc) (quoting *Khine v. Commonwealth*, 75 Va. App. 435, 442 n.1 (2022)).

inferences that may reasonably be drawn from that evidence.'" *Id.* (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020)).

On the evening of September 12, 2022, 12-year-old Za. F.[5] was walking home from the Golden Eagle market with her sisters and her aunt, 15-year-old T.H.,[6] when she saw a silver car behind a black car in the intersection of the 900 block of North 1st Street in the Jackson Ward section of Richmond. She described the people in the black car as "black, African-American," one with "wicks, like dreadlocks," "sitting and waiting," with "like ski masks on," and then she saw them "pull[] out their guns, and . . . start[] shooting" "from the passenger's side." Za. F. also saw a black Jeep further down North 1st Street near a truck. T.H. fell on the ground; after about six shots, the person by the Jeep "started shooting back" "towards the cars in the intersection." Za. F. said that when the shooting stopped, she ran to T.H., saw blood, "knew she wasn't okay," and called the police.

Richmond Police Department Officer Travis Harrell and his partner were the first responders to the shooting at approximately 7:30 p.m.; emergency medical services pronounced T.H. dead at the scene at 7:33 p.m. Detective Sergeant Jon Bridges arrived at the scene and assumed control of the investigation. He directed Officer John Gilbert to immediately view the camera system ("Tsunami") in the Gilpin Court housing community for the timeframe of the shooting. Tsunami video showed two vehicles, a black car and a light blue or grey sedan, traveling in tandem through the intersection of Gilpin Court at the time of the murder. A FLOCK[7] license

---

[5] Minor eyewitnesses are identified by their initials to protect their privacy.

[6] T.H., the victim, is identified by her initials to protect her privacy.

[7] FLOCK is a traffic camera system which reads and takes still photographs of license plate numbers.

plate reader produced still photographs of the cars and the license plates; the officers then confirmed the make, model, and year of the cars and identified the registered owners through the DMV.

Surveillance video from an apartment complex in Henrico showed Coley, Henderson, and Mitchell Hudson leaving the complex in a black Hyundai owned by Henderson's girlfriend, Tyesheia Stephens, at 6:33 p.m. Detective Patrick Ripley testified that the telephone records[8] showed that "multiple phones met up" at a BP gas station on Chamberlayne Avenue between 7:10 p.m. and 7:14 p.m. before proceeding to Gilpin Court. Surveillance video also showed that a black vehicle and a "silver bluish" vehicle met at the parking lot of the BP station, drove around the lot a bit, then left. The same vehicles were subsequently confirmed as those captured by the Tsunami and FLOCK systems at the scene of the shooting. The photographs matched the video clips of the two vehicles moving through the intersection.

Using the Tsunami videos and the FLOCK photographs, Detective Sergeant Bridges charted the movement of the two cars. FLOCK recorded the cars at 7:19:26 p.m. traveling toward the location of the shooting. The two vehicles were two to four seconds apart at every camera. At 7:23:18 p.m. the cars were first seen on video on West Charity, then seen driving northbound on North 1st Street. They "roll[ed] through the intersection" where the shooting occurred at 7:24:28 p.m., pausing twice before turning back onto North 1st Street. Although the Tsunami cameras did not provide a view of the passenger side of the vehicles, the investigators were able to track the two cars almost continuously for two to three minutes.

The estimated time of the shooting was 7:25:15 p.m. Aaron Logan said he was returning to his car in Jackson Ward the evening of September 12, 2022, when he saw a black car stop in the intersection and, thinking he saw someone he knew in the car, he raised his hand "to say what's up"

---

[8] The cellular telephone numbers and the carriers were attributed to each defendant during the investigation.

- 4 -

and "heard shots." He took cover behind the driver's side door of the Jeep, then stepped into the street to return fire at the black car and then at the grey car, a BMW,[9] after the black car turned off. There were a "lot" of shots fired from the BMW, and when they stopped, Logan left the scene. He said he emptied his "whole clip." Logan denied firing toward the sidewalk or the grassy area, where the children and T.H. were located. Logan saw T.H. walk away from the intersection on the sidewalk and then try to run. He did not see her get shot but did see her on the sidewalk afterwards. Soon after, the video showed a black Jeep parking on another street within Gilpin Court and Aaron Logan exiting the car.

When interviewed the next day, Logan said that he and Coley[10] had had an incident a few years earlier and that they had feuded on and off since then. Logan showed Detective Ripley an Instagram photograph of Coley and identified him as the person involved in the feud. Logan denied having issues with anyone else who might have shot at him.

Officer Luke Hunsaker stopped the silver BMW in the south side of Richmond on September 13, 2022, less than 24 hours after the murder. Rarmil Coley-Pettiford was driving. Officer Hunsaker's search of the car revealed a backpack with a rifle magazine holding .223 caliber rounds, additional rifle rounds, and two black ski masks. A second magazine holding 9mm rounds, which appeared to be for a Glock handgun, was also found in the backpack.

Henrico County Police Division (HCPD) Gang Investigation Team Sergeant Cary Wood stopped a light-colored Kia sedan coming from St. Luke's apartment complex on September 22, 2022. Coley was in the back left passenger seat beside Hudson. Sergeant Wood was familiar with Coley and Hudson and identified Coley in the courtroom. During the traffic stop, Sergeant Wood

---

[9] The grey BMW belonged to Coren Johnson. She allowed Rarmil Coley-Pettiford, her ex-boyfriend, to use the car on September 12, 2022.

[10] Logan referred to Coley as "Sticky."

recovered a bag containing four to five cellphones; the officer attributed the one with "Versace" on the back of the phone cover to Coley.

The multi-jurisdictional investigation established that the five co-defendants—Coley, Henderson, Hudson, Coley-Pettiford, and Jackson—were members of, or associated with, the 30 Boyz gang and confirmed that Coley had had an active dispute with Logan, the intended target of the shooting. The investigation culminated with charges of first-degree murder, attempted murder, use of firearms in the commission of murder and attempted murder, discharging a firearm in a public place, and discharging a firearm from a motor vehicle against Coley.

Before trial, Coley argued against the admission of the evidence of his gang affiliation, asserting that it was unduly prejudicial and not relevant unless "the gang-related evidence [was] closely tied to the actual homicide." The Commonwealth responded that the evidence of gang membership was relevant to motive and that expert testimony, provided to the defense in discovery, would be offered at trial and available for cross-examination. The trial court determined that evidence of gang affiliation was "relevant," "ha[d] a probative value that [was] not substantially outweighed by the danger of unfair prejudice or a likelihood of confusing or misleading the jury," and "[was] admissible for the purposes outlined" in Virginia Rule of Evidence 2:404(b).

The Commonwealth moved for a joint trial for the five co-defendants because all "got into two vehicles, and armed themselves, and drove over to the Gilpin Court neighborhood, and began engaging in a gun battle with an individual . . . with whom at least one of [the] defendant's [sic] had had a feud ongoing for years." "[T]hey noted that [Logan] was in that community, targeted him and began firing on him down a street in the middle of the day, around 7:00 p.m., where there were citizens milling about, one of whom was our victim . . . a 15 year old juvenile." The five

> engaged in the behavior together and they precipitated that plan
> with the same idea in mind, despite the fact that only some yielded

- 6 -

[sic] guns and pulled those triggers, and some held the steering
wheels and allowed for those vehicles to stop and then move again,
they are similarly situated under the law.

The Commonwealth stated that the evidence, the witnesses, and the victim and her family were the same. Further, the Commonwealth argued that there was a "very real chance" that if tried separately the five co-defendants would have disproportionate trial outcomes despite their equal culpability.

Some of the co-defendants argued that a joint trial would prejudice their individual trial rights, including violation of their right to confront co-defendants and their statements as witnesses. Coley adopted his co-defendants' arguments and expressed particular concern about jail communications and the admissibility of his co-defendants' statements if intended to "debunk an alibi" that he was not present at the shooting.

The trial court stated that the Commonwealth demonstrated "evidentiary factors, fairness, and consistency concerns" and had met its burden of good cause for joinder. In granting the Commonwealth's motion for joinder, the trial court was "not convinced that the specific trial rights raised by defense counsel [would] be materially hampered by joinder" and stated that the defendants had "not met the threshold of specific rights being prejudiced." The trial court found that "these defendants will not be deprived of specific trial rights" and "[m]oreover, to the extent that specific trial rights are implicated, counsel may also or alternatively address them with appropriate jury instructions." The trial court joined Coley and Henderson[11] for one trial and joined the remaining defendants for another.

---

[11] Coley and Henderson waived their respective rights to a speedy trial. The remaining co-defendants did not and proceeded to trial in February 2023.

Forensic Investigator Kathleen O'Connell found a cluster of cartridge casings[12] on the ground in the intersection where the cars appeared in the videos. Ballistics analysis revealed that the .223 rounds were clustered and fired from the same rifle and the 9mm rounds were clustered and fired from the same gun. Similarly, the .357 cartridges were from the same gun, identified as a Glock. Investigator O'Connell found a .38 cartridge near T.H.'s body and cellphone, likely fired from a .9mm or .357 firearm, but not a .40 caliber firearm. She found "all .40 caliber Smith and Wesson" casings in a cluster, fired from the same gun, a little beyond T.H.'s body.

Investigator O'Connell examined Logan's car and found an unfired .40 caliber bullet on the floorboard of the backseat, a full .45 cartridge in the driver door's pocket, a bullet lodged in the back hatchback, and impact or bullet holes on the passenger side of the car. The bullet lodged in his car was a .38 class bullet that ballistically matched two of the bullets found at the scene.

Investigator O'Connell also examined the silver BMW with a license plate THEDONN and heavily tinted windows. The .223 casings from the scene were the same caliber as those found in the magazine in the BMW, although with different head stamps. As to her forensic analysis of the black car, a Hyundai registered to Stephens, she found a box for a Glock 9mm handgun in the backseat, a wallet containing Stephens's driver's license, and some medical paperwork for Henderson.

Kelly Miller, a scientist from the Department of Forensic Science, was unable to meaningfully compare the co-defendants' DNA profiles with the DNA swabs from the door handles of the BMW or the ammunition magazines from the cars because there were "too many individuals whose DNA was mixed together." Nevertheless, Henderson and Coley were both

---

[12] Forensic Investigator O'Connell collected "about" fourteen 9mm cartridges, seven .357 cartridges, seven .223 cartridges, and .40 caliber casings from the intersection.

eliminated from the DNA profile she developed from the interior right passenger door of the Hyundai.

Federal Bureau of Investigation Special Agent Jeremy D'Errico conducted a cell site analysis and location tracking investigation using the cellular telephone call detail records of the five people. His Cellular Analysis Survey Team (CAST) report, introduced as evidence, showed a correlation between the co-defendants' cellular telephone locations, the movement of the vehicles captured by video before and after the shooting, and eyewitness statements. Coley's telephone neither sent nor received messages during a six-minute period when his co-defendants' phones were tracking toward the crime scene, but his phone did access a tower in the vicinity "sometime between 7:27 and 7:31" and established "a [data] record at 7:29." At 7:34 p.m., data records detailed Coley's and his co-actors' phones reporting back "[a]t the time [they] [were] getting out of Gilpin Court." At approximately 8:00 p.m., the phones of Coley and three co-actors travelled to Uptown Alley, a bowling alley, where security video showed that they arrived at 8:25 p.m. and left at approximately 11:00 p.m. Special Agent D'Errico said that the time from when the phones were at the BP station just before the shooting and the arrival at Uptown Alley was about 1 hour and 42 minutes.

Although subpoenaed, Stephens (Henderson's girlfriend) failed to appear at trial. The trial court issued a capias, and the Commonwealth, after informing the trial court that the Richmond police were having difficulty locating her, asked the officers to access jail calls between Henderson and Stephens to see if there was any conversation about her not coming to court or her whereabouts. The officers obtained a jail call between Henderson and Stephens made the day before the trial was to begin where the couple discussed "what [Henderson's] attorney said about witnesses who were not going to come" and how Henderson "would be good because they were not coming," and "encouraging other witnesses to 'fall off the face of the earth.'" During the call, Henderson did not mention Coley by name.

Coley moved to strike the evidence at the end of the Commonwealth's case, arguing that the Commonwealth failed to demonstrate that he was the "shooter," there was no identification of him in the vehicle, and no direct evidence collected implicated him. He disputed that one of the cell phones tracked by the FBI was his and posited that the Commonwealth failed to exclude "the very reasonable hypothesis that . . . Logan [was] the person who shot" T.H. The trial court denied Coley's motion to strike and his renewed motion at the close of the evidence, finding that the issues should go to the jury.

The parties disagreed about the inclusion of jury instructions on concert of action and the defendants being principals in the first or second degree. The trial court subsequently refused the charging instructions offered by the defense and elected to use instructions offered by the Commonwealth, satisfied that "these will be less confusing to the jury."

The jury returned guilty verdicts against Coley for first-degree murder of T.H. and use of a firearm in the commission of her murder. They found Coley guilty of attempted murder of Logan and use of a firearm in the commission of that offense. Further, the jury found Coley guilty of discharging a firearm in a public place resulting in bodily injury and discharging a firearm while in or on a motor vehicle.

Coley made oral motions to set aside the verdict but informed the trial court that he would submit the substantive motions in writing. At a subsequent hearing, Coley briefly argued his motion for a new trial based on alleged inappropriate evidence presented by the Commonwealth about his gang participation and the admission of Henderson's jail call, which Coley alleged unfairly implicated him. The trial court denied Coley's motions for a new trial and to set aside the verdict.

After hearing testimony and argument, and reviewing the sentencing guidelines, the trial court imposed a life sentence of incarceration on Coley, suspending all but 25 years. It imposed an additional 31 years for the other convictions. Coley appeals.

ANALYSIS

I.  The trial court did not abuse its discretion in denying Coley's motions.

"[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).  "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)).

A.  The trial court reasonably permitted joinder of Coley's and Henderson's trials.

We review a court's determination as to good cause and prejudice for an abuse of discretion.  *Allen v. Commonwealth*, 58 Va. App. 618, 622-23 (2011).  "Th[e] bell-shaped curve of reasonability governing [the Court's] appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023); *see also Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016).  Code § 19.2-262.1 provides that "for good cause shown, the court shall order persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses, to be tried jointly unless such joint trial would constitute prejudice to a defendant." *See also* Rule 3A:10(a).  The decision to order joinder "lies within the sound discretion of the trial court." *Dickerson v. Commonwealth*, 29 Va. App. 252, 254 (1999).  "A criminal defendant must demonstrate that a joint trial caused 'actual,' 'legally cognizable prejudice' to his rights." *Hargrove v. Commonwealth*, 77 Va. App. 482, 496 (2023)

(quoting *Allen*, 58 Va. App. at 623). "This occurs only when 'there is a serious risk that a joint trial . . . compromise[d] a specific trial right of one of the defendants' or when the joinder . . . 'prevent[ed] the jury from making a reliable judgment about guilt or innocence.'" *Id.* (alterations in original) (quoting *Allen*, 58 Va. App. at 623-24). "'The underlying determinations of good cause and prejudice involve a case-by-case exercise of the trial court's discretion' and will not be reversed on appeal absent an abuse of discretion." *Id.* (quoting *Allen*, 58 Va. App. at 622-23). Nevertheless, "[t]his Court reviews de novo whether the admission of evidence violates a defendant's confrontation right." *Id.* (alteration in original) (quoting *Logan v. Commonwealth*, 299 Va. 741, 745 (2021)).

"When affirming a ruling made [before] trial, [we] may consider [both] the proffers [made] at the pretrial hearing [and] the evidence presented at trial." *Allen*, 58 Va. App. at 620-21. Here, the trial court heard argument on the Commonwealth's motion for joinder on January 19, 2023. Coley endorsed the other defendants' arguments but made only a vague assertion that he "[understood] that there may be tablet information where they're alleging people are communicating. I don't know if there are jail calls," and commented that a ruling on joinder was premature because discovery was incomplete.

At the joinder hearing, Coley did not move to sever based on the possibility of jail calls or other communications. He did not establish that "actual prejudice would result from a joint trial." *Goodson v. Commonwealth*, 22 Va. App. 61, 71 (1996) (emphasis omitted). He did not argue a violation of his right to confrontation. He did not renew his motion against joinder at trial.[13] "As an appellate basis for reversing a pretrial severance ruling, however, evidence at trial

---

[13] At trial, Coley referenced the pretrial joinder hearing in arguing that Henderson's jail call with Stephens should not be admitted at the joint trial. But he did not seek severance nor did he ask the trial court to reconsider its prior joinder ruling. The argument focused on the admissibility of Henderson's statements, which is presented as a separate assignment of error.

becomes relevant only if the defendant renews his motion at trial." *Allen*, 58 Va. App. at 621. "Failure to renew the motion at trial . . . at a minimum is likely to limit appellate review to the question of whether the judge properly decided the pretrial motion on the facts then available to him." *Id.* (alteration in original) (quoting 5 Wayne R. LaFave, *Criminal Procedure* § 17.3(d), at 57 (3d ed. 2007)).

The trial court ultimately ruled that the statement in the jail call was "not excludable as hearsay." In exercising its obligation to balance any potential prejudice with "the effectiveness of . . . measures to cure any such risk," the trial court limited the portion of the call to be played to the jury. *Barnes v. Commonwealth*, 22 Va. App. 406, 412 (1996). It allowed a "limiting instruction[]" or curative jury instruction to ensure that the jury understood that Coley was not "implicated in this in any manner whatsoever." *Id.* The trial court did not abuse its discretion in rejecting Coley's pre-trial assertion that he would suffer actual prejudice if tried jointly with Henderson.

B. The record supports the trial court allowing evidence of gang affiliation.

"[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Id.* (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Cheripka v.*

*Commonwealth*, 78 Va. App. 480, 494 (2023) (quoting *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020)).

Coley contends that the trial court's decision to admit evidence of his gang affiliation amounted to inadmissible habit evidence and any probative value was greatly outweighed by its prejudicial effect. We disagree.

"Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." *Utz v. Commonwealth*, 28 Va. App. 411, 418 (1998) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)). "Evidence of other crimes, wrongs, or acts is inadmissible if offered merely to show the accused's propensity to commit the crime for which he is charged." *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022). But "[s]uch 'prior bad acts' evidence is admissible 'if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.'" *Id.* (quoting Va. R. Evid. 2:404(b)). "It is also well established that 'prior bad acts' evidence is admissible 'when it "shows the conduct or attitude of the accused toward his victim[,] [or] establishes the relationship between the parties."'" *Id.* (first alteration in original) (quoting *Kenner*, 299 Va. at 424).

"Although gang membership alone is not evidence of a defendant's prior bad conduct, a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior." *Utz*, 28 Va. App. at 420. As earlier noted, evidence of prior bad conduct is "admissible in certain situations." *Id.* Evidence of prior bad acts "may be properly admitted . . . to prove motive to commit the crime charged," or to "show the conduct and feeling of the accused toward his victim, or to establish their prior relations." *Id.* (quoting *Reynolds v. Commonwealth*, 24 Va. App. 220, 223-24 (1997)). "[T]he test is whether

- 14 -

the 'legitimate probative value outweighs the incidental prejudice to the accused.'" *Id.* at 421 (quoting *Reynolds*, 24 Va. App. at 223-24).

Detective Michael Kiniry, a task force officer assigned to the FBI on the Violent Gang Enterprise Squad group, agreed that it would often be "consistent [with] gang members, one or some [sic] whom have an issue with a person, to join together and commit a violent act like a shooting." Detective Kiniry said that it was not uncommon for people affiliated with a gang to participate in a crime even if they had no personal issue with the targeted individual. HCPD Detective Brian Kelly, a "gang detective," confirmed that Coley was a documented member of the 30 Boyz gang. He identified the St. Luke's apartment complex as a common gang meeting place and that co-actor Jackson's girlfriend lived there.

This explanation is consistent with the evidence of the other co-actors' participation when Coley executed his plan to shoot Logan. The evidence was that Coley had feuded with Logan for some time and left the St. Luke's apartment complex with members and associates of the gang with the intent to shoot Logan. We find that the testimony about gang membership was offered not as propensity evidence but rather for its legitimate probative value which, here, outweighed the risk of unfair prejudice. *Conley*, 74 Va. App. at 670-71.

C. The trial court properly admitted the Henderson jail call.

"[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Pulley v. Commonwealth*, 74 Va. App. 104, 118 (2021) (alteration in original) (quoting *Jones v. Commonwealth*, 71 Va. App. 597, 602 (2020)). A trial "court has 'broad discretion' regarding the admission of evidence and . . . any ruling on admissibility will not be overturned absent an 'abuse of discretion.'" *Vera v. Commonwealth*, 77 Va. App. 271, 282 (2023) (quoting *Conley*, 74 Va. App. at 670).

Mid-trial, the Commonwealth's efforts to locate Stephens produced a jail call between Henderson and Stephens where they anticipated the absence of certain witnesses and would be encouraged to "fall off the face of the earth." Although the Commonwealth had previously stated that it would not seek to admit a co-defendant's statements, the trial court ruled that "the defendants [had] not identified any authority equitable or otherwise that would preclude the Commonwealth from the audio" and it would not be precluded "based on statements made at the January 19[], 2023, joinder hearing."

The trial court ruled that the recording was not hearsay because it was not being offered for the truth of the matter asserted. It found that the "only portion of the that [sic] contains probative information that is not substantially outweighed by the risk of undue prejudice or other concerns outlined in Rule 2:403" was at "0 minutes and 38 seconds to 2 minutes and 55 seconds" and limited the Commonwealth to playing only that portion for the jury. Additionally, the trial court ruled that it was allowing a limiting instruction to make it clear that Coley was not implicated in the jail call exchange. The limiting instruction stated, "you may not consider these [statements made by Henderson during a telephone call] against Tyree Coley in any way during your deliberation." "Juries are presumed to follow prompt, explicit, curative instructions from the trial judge." *Mills v. Commonwealth*, 24 Va. App. 415, 420 (1997). The record is clear that the trial court imposed sufficient remedies to ensure that the jury considered the contents of the call only in its deliberations about Henderson. We find no reason to disturb the trial court's judgment.

D. The evidence supported instructing the jury on the theory of concert of action.

"[C]oncert of action [is] a species of accomplice liability, carrying with it the principle that the punishment imposed on each accomplice may be the same." *Parson v. Commonwealth*, 74 Va. App. 428, 445 n.9 (2022) (alterations in original) (quoting *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 279 (2015)). The theory provides that when conspirators

execute a plan to commit a specific offense and one of the conspirators commits another crime in the process, all conspirators are criminally liable for that crime—even if unintended—provided it was an "incidental probable consequence" of their plan's execution. *Thomas v. Commonwealth*, 279 Va. 131, 157 (2010) (quoting *Brown v. Commonwealth*, 130 Va. 733, 738 (1921)). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" *Parson*, 74 Va. App. at 445 n.9 (alteration in original) (quoting *Hampton v. Commonwealth*, 34 Va. App. 412, 418 (2001)). The theory of concert of action is a variation on the natural and probable consequences doctrine—all participants in the action are treated the same even if only one participant caused the ultimate harm. "In effect, the participant who does not cause the ultimate harm is a principal in the second degree to the participant who does cause that harm." Roger D. Groot, *Criminal Offenses and Defenses in Virginia* 91 (4th ed. Supp. 2002).

Coley contends that the trial court erred by instructing the jury on concert of action "even if they did not believe he was present at the scene of the crime." The legal definition of concert of action does not require the physical presence of a principal in the second degree at the scene of the crime, nor is presence alone sufficient to make someone a principal in the second degree. *Sutton v. Commonwealth*, 228 Va. 654, 666 (1985). Here, there was "more than a scintilla" of evidence that Coley was in concert of action in T.H.'s murder and Logan's attempted murder. *Hampton*, 34 Va. App. at 417. We view the evidence in the "light most favorable to the party offering the instruction," here the Commonwealth. *Id.* at 418. We find that the "law [was] clearly stated and that the instructions cover[ed] all issues which the evidence fairly raise[d]." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). We find the trial court did not err in instructing the jury on concert of action.

E. The trial court correctly denied Coley's motion for a new trial.

"[E]rrors assigned because of a prosecutor's improper comments . . . during argument will not be considered on appeal unless the accused timely moves for a cautionary instruction or for a mistrial." *Harvey v. Commonwealth*, 76 Va. App. 436, 458 (2023) (second alteration in original) (quoting *Martinez v. Commonwealth*, 241 Va. 557, 559 n.2 (1991)). There is "no exception in Virginia law to the strict application of this rule." *Id.* at 459 (quoting *Bennett v. Commonwealth*, 29 Va. App. 261, 281 (1999)).

Here, Coley objected to the prosecutor's closing arguments, but he did not move for a mistrial or request a cautionary instruction as "required to preserve the issue for appeal." *Bennett*, 29 Va. App. at 281. We thus find the argument is barred and we do not consider it.

II. The evidence was sufficient to prove Coley's guilt.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Barney*, 302 Va. at 97 (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might

- 18 -

differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

A. The evidence established that Coley was a principal in the second degree.

A defendant is guilty as a principal in the second degree when he acts in concert of action with the perpetrator(s) of the offense. *Carter v. Commonwealth*, 232 Va. 122, 125 (1986). When a group acts in such a way that the resulting crime is "one of [the] incidental probable consequences" of such group action, "all who participate in any way in bringing about [that] crime[] are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime." *Winston v. Commonwealth*, 268 Va. 564, 602 (2004). Principals in the second degree may be indicted, tried, convicted, and punished as principals in the first degree. Code § 18.2-18; *Sutton*, 228 Va. at 665 (citing *Riddick v. Commonwealth*, 226 Va. 244, 248 (1983)).

Read in the light most favorable to the Commonwealth, the evidence was sufficient to establish that Coley acted in concert with the others and was guilty as a principal in the second degree. First, and perhaps most important, Coley was the person with the ongoing feud with Logan, the intended target. Second, there is evidence that Coley was a member of the 30 Boyz gang and left a known gang meeting place in a black car which traveled to another meeting place and then to Gilpin Court. Third, surveillance video showed Coley getting into the passenger side of the black car from which shots were fired at Logan. Fourth, Coley's cellular telephone was tracked just before and immediately after the shooting in the area along with the cellular phones attributed to the other co-actors. Fifth, immediately after the shooting, Coley's and some of the co-actors' cellular telephones tracked together to the Uptown Alley, where they stayed for approximately three hours—still together. In short, evidence established that Coley and the people in both cars fired bullets at Logan at the same time from the same direction—causing

T.H.'s death—and then drove away together in the same direction. T.H.'s death was a "probable consequence" of their actions and Coley is equally answerable for the crime as are the others as a principal in the second degree.

B. The evidence was sufficient for the jury to find that either Coley or one of his co-actors fired the shot that killed T.H.

Similarly, "[w]hen reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Konadu v. Commonwealth*, 79 Va. App. 606, 613 (2024) (second alteration in original) (quoting *McGowan*, 72 Va. App. at 521). The question on appeal is not if the Court believes the evidence at trial was sufficient, but rather if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)).

"It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

Here, the evidence was sufficient that Coley and his co-actors were present and responsible for T.H.'s murder. The surveillance videos and license plate readers show Coley and the others at St. Luke's apartment complex and then leaving in a black Hyundai. Their cellular phones tracked together to another meeting place—the BP station—just before traveling to North

- 20 -

1st Street in the Gilpin Court area. The two cars were videoed and tracked coming through the intersection, pausing, then leaving at the time of T.H.'s murder. Coley and some of the co-actors' cell phones continued to track together to Uptown Alley, where there arrived shortly after the murder and stayed until later that night. The shell casings found by the forensic investigator in the intersection were fired from the same guns and were consistent with the ammunition found in the magazines discovered in the BMW. The caliber of the bullets lodged in Logan's car were consistent with the casings in the intersections and near T.H.'s body. The casings found further away from her body were different from those in the intersection. Eyewitnesses described at least one of the men in the cars as wearing a ski mask—two ski masks were found in the BMW. Eyewitnesses saw the men in the Hyundai and the BMW pull out guns and start shooting in the direction of Logan's car. Simply put, upon the evidence, a reasonable finder of fact could conclude beyond a reasonable doubt that Coley or his co-actors fired the shot that murdered T.H.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed. The matter is remanded to the trial court for the limited purpose of correcting a scrivener's error in the final order, as noted above.

*Affirmed and remanded.*