COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued by videoconference

SAVONNE DEMONTRE HENDERSON

MEMORANDUM OPINION* BY
v.        Record No. 1649-23-2                JUDGE JEAN HARRISON CLEMENTS
SEPTEMBER 9, 2025
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Phillip L. Hairston, Judge Designate

Wesley B. Simon (Stephen A. Mutnick; The Simon Law Firm;
Winslow, McCurry & MacCormac, PLLC, on brief), for appellant.

Elizabeth K. Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General; Matthew P. Dullaghan, Senior Assistant
Attorney General,[1] on brief), for appellee.

In a joint trial, a jury convicted Savonne Demontre Henderson and Tyree Marcus Coley[2] of

first-degree murder, attempted murder, using or attempting to use a firearm in the commission of

murder, using a firearm in the commission of attempted murder, discharging a firearm in a public

place with injury, and discharging a firearm from a motor vehicle.

Before sentencing, the trial court heard argument on Henderson's motion to set aside the

verdict and motion for a new trial.  Denying the motions, the trial court sentenced Henderson to

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Matthew P. Dullaghan became an employee of this Court on February 10, 2025.  He has
had no involvement in the Court's review of this case.

[2] Tyree Marcus Coley's appeal is before this Court.  *Coley v. Commonwealth*, No.
2109-23-2 (decided this day).

incarceration for life imprisonment for the first-degree murder conviction, suspending all but 25 years, plus 31 years combined on the other convictions for an active sentence of 56 years.[3]

In his appeal, Henderson contends that the trial court erred on multiple issues, including in granting the Commonwealth's motion for joinder, denying his motion to dismiss for failure to preserve exculpatory evidence, denying his motion regarding officer body worn camera footage, denying his motion regarding gang evidence, denying his motion to expand the jury pool, denying his motion related to opinion evidence on video, admitting evidence of his jail call, and granting the jury instruction on the theory of concert of action. Henderson also contends that the evidence was insufficient to support a conviction on all charges. We find no merit in Henderson's arguments and affirm the jury verdicts and the trial court's rulings.

BACKGROUND[4]

On appeal, "[t]his Court reviews the facts in the light most favorable to the Commonwealth, the prevailing party" below. *Carter v. Commonwealth*, 79 Va. App. 329, 334 (2023). "We 'regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence.'" *Id.* (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020)).

---

[3] We note that the sentencing summary in the final order incorrectly reflects Henderson's sentence as life plus 31 years of imprisonment with 25 years suspended. We remand the case to the trial court for the limited purpose of correcting the sentencing summary to state Henderson's sentence as life plus 31 years of imprisonment and that all but 25 years of the life sentence was suspended. *See* Code § 8.01-428(B).

[4] Consideration of the issues raised requires unsealing portions of the record. "To the extent that specific facts mentioned here are found in the sealed portions of the record, we unseal those portions only as to those specific facts." *Thomas v. Commonwealth*, 82 Va. App. 80, 93 n.4 (2024) (en banc) (quoting *Khine v. Commonwealth*, 75 Va. App. 435, 442 n.1 (2022)).

On the evening of September 12, 2022, 12-year-old Za. F.[5] was walking home from the Golden Eagle market with her sisters and her aunt, 15-year-old T.H.,[6] when she saw a silver car behind a black car in the intersection of the 900 block of North 1st Street in the Jackson Ward section of Richmond. She described "like three" people in the black car as "black, African-American," one with "wicks, like dreadlocks," "sitting and waiting," with "like ski masks on," and then she saw them "pull[] out their guns, and . . . start[] shooting" "from the passenger's side." Za. F. also saw a black Jeep further down North 1st Street near a truck. T.H. fell on the ground; after about six shots, the person by the Jeep "started shooting back" "towards the cars in the intersection." Za. F. said that when the shooting stopped, she ran to T.H., saw blood, "knew she wasn't okay," and called the police.

Zi. F.[7] said that it was still light when she, T.H., and Za. F. left for the store to get snacks, but that it was getting dark. Zi. F. and her two younger sisters took a different route to the intersection than Za. F. and T.H. and had crossed the intersection before the shootings. Zi. F. noticed certain cars in the intersection, including one that "almost hit T.H." Zi. F. then heard "a lot" of gunshots, "more than 10" but she was not sure if it was "more than 20." The shots coming from the cars were shooting in the direction where T.H. was walking. She noticed a car parked near a truck with someone getting in the car when the shots were being fired. Zi. F. hid behind a building, then saw T.H. on the ground in the middle of the sidewalk. She ran over to T.H., and the police arrived shortly thereafter.

Richmond Police Department (RPD) Officer Travis Harrell and his partner were the first responders to the shooting around 7:30 p.m. and initiated chest compressions while emergency

---

[5] Minor eyewitnesses are identified by their initials to protect their privacy.

[6] T.H., the victim, is identified by her initials to protect her privacy.

[7] Zi. F. is the 14-year-old sister of Za. F. and T.H.'s niece.

medical services were on the way. T.H. had no pulse and was pronounced dead at the scene at 7:33 p.m.

RPD Detective Sergeant Jon Bridges arrived at the scene and assumed control of the investigation. He directed RPD Officer John Gilbert to immediately view the camera system ("Tsunami") in the Gilpin Court housing community for the timeframe of the shooting. Tsunami video showed two vehicles, a black car and a light blue or grey sedan, traveling in tandem through the intersection of Gilpin Court at the time of the murder. A FLOCK[8] license plate reader produced still photographs of the cars and the license plates; the officers then confirmed the make, model, and year of the cars and identified the registered owners through the DMV.

Surveillance video from an apartment complex in Henrico showed Coley, Henderson, and Mitchell Hudson leaving the complex in a black Hyundai owned by Henderson's girlfriend, Tyesheia Stephens, at 6:33 p.m. RPD Detective Patrick Ripley testified that the telephone records[9] of the multiple participants in the shooting showed that "multiple phones met up" at a BP gas station on Chamberlayne Avenue between 7:10 p.m. and 7:14 p.m. before proceeding to Gilpin Court. Surveillance video also showed that a black vehicle and a "silver bluish" vehicle met at the parking lot of the BP station, drove around the lot a bit, then left. The same vehicles were later confirmed as those captured by the Tsunami and FLOCK systems at the scene of the shooting. The photographs matched the video clips of the two vehicles moving through the intersection.

Using the Tsunami videos and the FLOCK photographs, RPD Detective Sergeant Bridges charted the movement of the two cars. FLOCK recorded the cars at 7:19:26 p.m. traveling toward the location of the shooting. The two vehicles were two to four seconds apart at every camera. At

---

[8] FLOCK is a traffic camera system which reads and takes still photographs of license plate numbers.

[9] The cellular telephone numbers and the carriers were attributed to each defendant during the investigation.

7:23:18 p.m. the cars were first seen on video on West Charity, then seen driving northbound on North 1st Street. They "roll[ed] through the intersection" where the shooting occurred at 7:24:28 p.m., pausing twice before turning back onto North 1st Street. Although the Tsunami cameras did not provide a view of the passenger side of the vehicles, the investigators were able to track the two cars almost continuously for two to three minutes.

The estimated time of the shooting was 7:25:15 p.m. Aaron Logan said he was returning to his car in Jackson Ward the evening of September 12, 2022, when he saw a black car stop in the intersection and, thinking he saw someone he knew in the car, he raised his hand "to say what's up" and "heard shots." He took cover behind the driver's side door of the Jeep, then stepped into the street to return fire at the black car and then at the grey car, a BMW,[10] after the black car turned off. There were a "lot" of shots fired from the BMW, and when they stopped, Logan left the scene. He said he emptied his "whole magazine." Logan denied firing toward the sidewalk or the grassy area, where the children and T.H. were located. Logan saw T.H. walk away from the intersection on the sidewalk and then try to run. He did not see her get shot but did see her on the sidewalk afterward. Soon after, the video showed a black Jeep parking on another street within Gilpin Court and Aaron Logan exiting the car.

When interviewed the next day, Logan said that he and Coley[11] had had an incident a few years earlier and that they had feuded on and off since then. Logan showed Detective Ripley an Instagram photograph of Coley and identified him as the person involved in the feud. Logan denied having issues with anyone else who might have shot at him.

---

[10] The grey BMW belonged to Coren Johnson. She allowed Rarmil Coley-Pettiford, her ex-boyfriend, to use the car on September 12, 2022.

[11] Logan referred to Coley as "Sticky."

Officer Luke Hunsaker stopped the silver BMW in the south side of Richmond on September 13, 2022, less than 24 hours after the murder. Rarmil Coley-Pettiford was driving. Officer Hunsaker's search of the car revealed a backpack with a rifle magazine holding .223 caliber rounds, additional rifle rounds, and two black ski masks. A second magazine holding 9mm rounds, which appeared to be for a Glock handgun, was also found in the backpack.

Henrico County Police Division (HCPD) Gang Investigation Team Sergeant Cary Wood stopped a light-colored Kia sedan coming from St. Luke's apartment complex on September 22, 2022. During the traffic stop, Sergeant Wood recovered a bag containing four to five cellphones.

The multi-jurisdictional investigation established that the five co-defendants—Henderson, Coley, Hudson, Coley-Pettiford, and Jackson—were members of, or associated with, the 30 Boyz gang and confirmed that Coley had had an active dispute with Logan, the intended target of the shooting. The investigation culminated with charges of first-degree murder, attempted murder, use of firearms in the commission of murder and attempted murder, discharging a firearm in a public place, and discharging a firearm from a motor vehicle against Henderson.[12]

The Commonwealth moved for a joint trial for the five co-defendants because all "got into two vehicles, and armed themselves, and drove over to the Gilpin Court neighborhood, and began engaging in a gun battle with an individual . . . with whom at least one of [the] defendant's [sic] had had a feud ongoing for years." "[T]hey noted that [Logan] was in that community, targeted him and began firing on him down a street in the middle of the day, around 7:00 p.m., where there were citizens milling about, one of whom was our victim . . . a 15 year old juvenile." The five

> engaged in the behavior together and they precipitated that plan
> with the same idea in mind, despite the fact that only some yielded
> [sic] guns and pulled those triggers, and some held the steering

---

[12] Henderson waived indictment by a grand jury and was charged with four offenses on a criminal information. He was charged with three additional offenses thereafter.

> wheels and allowed for those vehicles to stop and then move again, they are similarly situated under the law.

The Commonwealth stated that the evidence, the witnesses, and the victim and her family were the same as relating to each co-defendant. The Commonwealth also argued that there was a "very real chance" that if tried separately the five co-defendants would have disproportionate trial outcomes despite their equal culpability.

Some of the co-defendants argued that a joint trial would prejudice their individual trial rights, including violation of their right to confront co-defendants and their statements as witnesses. Henderson adopted his co-defendants' arguments, challenged good cause for the joinder, and expressed particular concern about the defendants' trial rights and the logistics of such a joint trial.

The trial court stated that the Commonwealth demonstrated "evidentiary factors, fairness, and consistency concerns" and had met its burden of demonstrating good cause for joinder. In granting the Commonwealth's motion for joinder, the trial court was "not convinced that the specific trial rights raised by defense counsel [would] be materially hampered by joinder" and stated that the defendants had "not met the threshold of specific rights being prejudiced." The trial court found that "these defendants will not be deprived of specific trial rights" and "[m]oreover, to the extent that specific trial rights are implicated, counsel may also or alternatively address them with appropriate jury instructions." The trial court joined Coley and Henderson[13] for one trial and joined the remaining defendants for another.

Before trial, Henderson filed a series of motions *in limine*: first, two motions to exclude any "description, narration [sic] or commentary by any witness, law enforcement or otherwise of any video by the Commonwealth"; second, to expand the jury pool and allow for equal strikes for all parties; third, to exclude the body worn camera video of RPD Officer Triana as highly

---

[13] Henderson and Coley waived their respective rights to a speedy trial. The remaining co-defendants did not and proceeded to trial in February 2023.

inflammatory, irrelevant to the case, and more prejudicial than probative; fourth, to exclude the video identification of a witness/victim; fifth, to dismiss because of the Commonwealth's destruction of exculpatory evidence; and sixth, to bar gang affiliation evidence. The Commonwealth filed written responses objecting to all motions. The trial court heard additional arguments on June 1, 2023, and took the matters under advisement. The trial court issued an order on June 7, 2023, denying Henderson's motions to dismiss, to allocate strikes, to exclude Officer Triana's body worn footage, to exclude evidence of gang affiliation, and to exclude opinion testimony at trial.

RPD Forensic Investigator Kathleen O'Connell found a cluster of cartridge casings[14] on the ground in the intersection where the cars appeared in the videos. Ballistics analysis revealed that the .223 rounds were clustered and fired from the same rifle, and the 9mm rounds were clustered and fired from the same gun. Similarly, the .357 cartridges were from the same gun, identified as a Glock. Investigator O'Connell found a .38 cartridge near T.H.'s body and cellphone, likely fired from a 9mm or .357 firearm, but not a .40 caliber firearm. She found "all .40 caliber Smith and Wesson" casings in a cluster, fired from the same gun, a little beyond T.H.'s body.

Investigator O'Connell examined Logan's car and found an unfired .40 caliber bullet on the floorboard of the backseat, a full .45 cartridge in the driver door's pocket, a bullet lodged in the back hatchback, and impact or bullet holes on the passenger side of the car. The bullet lodged in his car was a .38 class bullet that ballistically matched two of the bullets found at the scene.

---

[14] Forensic Investigator O'Connell collected "about" fourteen 9mm cartridges, seven .357 cartridges, seven .223 cartridges, and .40 caliber casings from the intersection.

Investigator O'Connell also examined the silver BMW with a license plate THEDONN and heavily tinted windows. The .223 casings from the scene were the same caliber as those found in the magazine in the BMW, although with different head stamps. As to her forensic analysis of the black car, a Hyundai registered to Stephens, she found a box for a Glock 9mm handgun in the backseat, a wallet containing Stephens's driver's license, and some medical paperwork for Henderson.

Kelly Miller, a scientist from the Department of Forensic Science, was unable to meaningfully compare the co-defendants' DNA profiles with the DNA swabs from the door handles of the BMW or the ammunition magazines from the cars because there were "too many individuals whose DNA was mixed together." That said, Henderson was eliminated from the DNA profile she developed from the interior right passenger door of the Hyundai.

RPD Detective Michael Kiniry, on assignment to the FBI's Violent Gang Enterprise Squad group in Richmond, described the "13th" gang as originating in the Washington Park neighborhood where Henderson grew up and previously associated; the gang was considered a "homegrown" local gang whose members were involved in "burglaries, robberies, drug distribution, and shootings." Detective Kiniry, who was qualified as an expert witness on gang activity, described a "split" between 30 Boyz and the 13th gang over an internal issue and members chose sides. He said that Henderson began associating with 30 Boyz in the spring of 2022 and that he saw Henderson on the scene of a homicide of a 30 Boyz member in May 2022. Detective Kiniry specified that his surveillance was limited to social media posts involving Henderson and other 30 Boyz members. Henderson was not documented as a 30 Boyz member until after the murder of T.H.

Detective Kiniry said that it would be consistent for gang members to join in a violent act against someone who has an issue with another gang member. He described the purpose as either proving one's status to the gang or to "boost [one's] status or hierarchy" within the gang.

Detective Kiniry explained that, particularly with neighborhood gangs in Richmond, it was common for members to participate in the criminal activity even without a personal animus to the intended target. Often the gang members would post rap songs about the crimes they have committed on social media to "instill fear in a neighborhood" and to gain recognition on social media.

Federal Bureau of Investigation (FBI) Special Agent Jeremy D'Errico conducted a cell site analysis and location tracking investigation using the cellular telephone call detail records of the five co-defendants. His Cellular Analysis Survey Team (CAST) report, introduced as evidence, showed a correlation between the co-defendants' cellular telephone locations, the movement of the vehicles captured by video before and after the shooting, and eyewitness statements. Henderson's phone[15] was active and moving toward the crime scene at 7:23:42 p.m., 7:23:53 p.m., and 7:24:28 p.m. Special Agent D'Errico clarified that Henderson's cell records were "even better" because of the timing advance records provided by his carrier.[16] The tracking showed Henderson's phone exiting the Gilpin Court area at 7:25 p.m., then 7:26 p.m. to 7:27 p.m. Henderson's phone gets to another co-defendant's residence around 7:42 p.m. or 7:43 p.m. His phone, along with those of Coley, Jackson, and Hudson, all moved toward Uptown Alley at roughly 8:02 p.m. The phones arrive at 8:25 p.m., and stay until 11:15 p.m. Security video from Uptown Alley showed the four arriving at 8:25 p.m. and leaving around 11:00 p.m. Special Agent D'Errico said that the time from when the phones were at the BP station just before the shooting and the arrival at Uptown Alley was about 1 hour and 42 minutes.

Although subpoenaed, Stephens (Henderson's girlfriend) failed to appear at trial. The trial court issued a capias, and the Commonwealth, after informing the trial court that the RPD

---

[15] Characterized as a green dot on the CAST tracking graphs.

[16] Special Agent D'Errico said that Henderson's phone had about 100 timing advance records between 8:25 p.m. and 11:01 p.m. the night of the murder.

were having difficulty locating her, asked the RPD officers to access jail calls between Henderson and Stephens to see if there was any conversation about her not coming to court or her whereabouts. The officers obtained a jail call between Henderson and Stephens made the day before the trial started where the couple discussed "what [Henderson's] attorney said about witnesses who were not going to come" and how Henderson "would be good because they were not coming," and "encouraging other witnesses to 'fall off the face of the earth.'"

Henderson moved to strike the evidence at the end of the Commonwealth's case, arguing that the Commonwealth failed to demonstrate that he was the principal in the first or second degree in T.H.'s murder and that there was no evidence of which gun actually killed her. He argued that the Commonwealth failed to present sufficient evidence to sustain convictions for any of Henderson's charges. The trial court denied Henderson's motion to strike and his renewed motion at the close of the evidence, finding that the issues should go to the jury.

The parties disagreed about the inclusion of jury instructions on concert of action and the defendants being principals in the first or second degree. The trial court subsequently refused the charging instructions offered by the defense and elected to use instructions offered by the Commonwealth, satisfied that "these will be less confusing to the jury."

The jury returned guilty verdicts against Henderson for first-degree murder of T.H. and use of a firearm in the commission of her murder. They found Henderson guilty of the attempted murder of Logan and use of a firearm in the commission of that offense. Further, the jury found Henderson guilty of discharging a firearm in a public place resulting in bodily injury and discharging a firearm while in or on a motor vehicle.

Henderson made oral motions to set aside the verdict but informed the trial court that he would submit the substantive motions in writing. At a subsequent hearing, Henderson briefly argued his motion to set aside the verdict focusing on the jury instruction for concert of action.

Relying on an unpublished opinion of this Court, *Sayers v. Commonwealth*, Record No. 0382-22-1 (Va. Ct. App. June 20, 2023), Henderson argued that the instruction given omitted the second element of principal in the second degree, and therefore was not a proper statement of the law. The trial court denied Henderson's motions for a new trial and to set aside the verdict.

After hearing testimony and argument, and reviewing the sentencing guidelines, the trial court imposed a life sentence of incarceration on Henderson, suspending all but 25 years. It imposed an additional 31 years for the other convictions. Henderson appeals.

ANALYSIS

"Appellate courts have sometimes lamented that 'the number of claims raised in an appeal is usually in inverse proportion to their merit.'" *Tatusko v. Commonwealth*, 79 Va. App. 721, 727 (2024) (quoting *Commonwealth v. Ellis*, 534 Pa. 176 (1993)). "When a party comes to us with nine grounds for reversing the [trial] court, that usually means there are none." *Id.* (alteration in original) (quoting *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012)).

I. The trial court did not abuse its discretion in denying Henderson's motions.

"[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)).

1.  The trial court reasonably permitted joinder of Henderson's and Coley's trial.

We review a court's determination as to good cause and prejudice for an abuse of discretion. *Allen v. Commonwealth*, 58 Va. App. 618, 622-23 (2011). "Th[e] bell-shaped curve of reasonability governing [the Court's] appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023); *see also Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016)). Code § 19.2-262.1 provides that "for good cause shown, the court shall order persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses, to be tried jointly unless such joint trial would constitute prejudice to a defendant." *See also* Rule 3A:10(a). The decision to order joinder "lies within the sound discretion of the trial court." *Dickerson v. Commonwealth*, 29 Va. App. 252, 254 (1999). "A criminal defendant must demonstrate that a joint trial caused 'actual,' 'legally cognizable prejudice' to his rights." *Hargrove v. Commonwealth*, 77 Va. App. 482, 496 (2023) (quoting *Allen*, 58 Va. App. at 623). "This occurs only when 'there is a serious risk that a joint trial . . . compromise[d] a specific trial right of one of the defendants' or when the joinder . . . 'prevent[ed] the jury from making a reliable judgment about guilt or innocence.'" *Id.* (alterations in original) (quoting *Allen*, 58 Va. App. at 623-24). "'The underlying determinations of good cause and prejudice involve a case-by-case exercise of the trial court's discretion' and will not be reversed on appeal absent an abuse of discretion." *Id.* (quoting *Allen*, 58 Va. App. at 622-23). Nevertheless, "[t]his Court reviews de novo whether the admission of evidence violates a defendant's confrontation right." *Id.* (alteration in original) (quoting *Logan v. Commonwealth*, 299 Va. 741, 745 (2021)).

"When affirming a ruling made [before] trial, [we] may consider [both] the proffers [made] at the pretrial hearing [and] the evidence presented at trial." *Allen*, 58 Va. App. at

620-21. Here, the trial court heard argument on the Commonwealth's motion for joinder on January 19, 2023. Henderson adopted the arguments made by the other defendants, but questioned whether there was good cause because "[t]here are not a lot [of] eyewitnesses" and that "nobody, other than Mr. Logan who was at the scene . . . can testify to anything." He also raised the conceptual issue of certain trial rights based on different elections each can make—jury versus bench trial, jury sentencing versus judge sentencing—being compromised in joint trial. Henderson, though, did not specifically argue how his trial elections would be prejudiced by Coley's.

At the joinder hearing, Henderson did not move to sever based on confrontation rights or potentially incriminatory statements made by other co-defendants. He did not argue any point that would establish a sufficient "prejudice would result from a joint trial." *Goodson v. Commonwealth*, 22 Va. App. 61, 71 (1996). Nor did he renew his motion against joinder at trial. "Failure to renew the motion at trial . . . at a minimum is likely to limit appellate review to the question of whether the judge properly decided the pretrial motion on the facts then available to him." *Allen*, 58 Va. App. at 621 (alteration in original) (quoting 5 Wayne R. LaFave, *Criminal Procedure* § 17.3(d), at 57 (3d ed. 2007)). We find no error in the trial court's joinder of Henderson and Coley's trials.

2. The trial court appropriately denied Henderson's motion to dismiss for failure to preserve exculpatory evidence.

When alleging an improper preservation of exculpatory evidence, "the burden is on [the] appellant to show that the trial court erred." *Gagelonia v. Commonwealth*, 52 Va. App. 99, 112 (2008) (quoting *Galbraith v. Commonwealth*, 18 Va. App. 734, 739 (1994)). On appeal, this Court "review[s] the trial court's findings of historical fact only for 'clear error'" but considers its "application of defined legal standards to the particular facts of [the] case [de novo]."

- 14 -

*Castillo v. Commonwealth*, 70 Va. App. 394, 466 (2019) (quoting *Doss v. Commonwealth*, 59 Va. App. 435, 455 (2012)).

Relying on *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988), Henderson contends that the Richmond Police officers' failure to preserve one Tsunami traffic video in its original form "violate[d] [his] due process rights" and that it was done in bad faith. We disagree. RPD Sergeant Bridges said that it was "common practice" for an officer to watch or review the footage but "assign someone else to actually download it that has that ability." He clarified that there is no dedicated resource in the department to download, so here, he directed RPD Officer Gilbert to access and preserve the video at the 4th Precinct police department.[17] RPD Sergeant Bridges joined Officer Gilbert and viewed the video with other detectives. The next day, Sergeant Bridges made a "specific request" of another employee to download video from "a couple of key cameras." The individual did not provide Sergeant Bridges with one of the camera views that Bridges had viewed the night before. The camera angle depicted "the two vehicles that [they] saw traveling in tandem roll through [the] intersection at the time of the murder." The officers had made a cellphone video of the video that night and the relevant portion of the clip was captured in accurate detail.

Citing *Gagelonia*, 52 Va. App. at 112, and referencing a *Brady*[18] violation, Henderson acknowledges that the defendant must show the exculpatory value of the evidence, not be able to obtain comparable evidence from other sources, and prove that the Commonwealth acted in bad faith. Henderson received a copy of the evidence in discovery. The video of the original

---

[17] RPD Sergeant Bridges explained that the Tsunami system videos cannot be accessed on scene. The videos can only be accessed in an office with "specialized laptops, or specially outfitted computers that can pull the camera footage." Access is limited to specially trained officers with the knowledge of how to "pull down the video."

[18] *Brady v. Maryland*, 373 U.S. 83 (1963).

Tsunami video was played for the jury without objection. He claims that the video would have supported his theory that there was no proof whose bullet killed T.H. and could have been a bullet fired by Logan. The evidence presented at trial does not support Henderson's claim and does not satisfy the first prong of the *Gagelonia* test.

There is no evidence that the police or the Commonwealth "had knowledge of the exculpatory value of the evidence when lost or destroyed," as Henderson claims. Sergeant Bridges clarified that the video was preserved but not in the "typical format . . . but it was captured." On cross-examination, Sergeant Bridges confirmed that the "video of the video" and the original download from the camera were of equal quality. Further, Sergeant Bridges said that he did not know that the clip had not been saved until 23 days later. There was no evidence that Sergeant Bridges or anyone involved with the investigation intentionally lost or destroyed the video clip in bad faith, and any argument to the contrary is meritless. The *Gagelonia* test is a conjunctive one; having rejected the arguments of the first two prongs, we find no need to consider the third.

3. The trial court properly denied Henderson's motion *in limine* regarding Officer Harrell's body camera video.

"[M]ost relevant evidence offered by the Commonwealth in a criminal case is potentially damaging to a defendant." *Turner v. Commonwealth*, 65 Va. App. 312, 330 (2015). The mere fact that relevant evidence is prejudicial to a defendant is insufficient to exclude it under Virginia Rule of Evidence 2:403. *Id.* "Photographs of a victim are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime." *Juniper v. Commonwealth*, 271 Va. 362, 413 (2006) (citing *Walton v. Commonwealth*, 256 Va. 85, 92 (1998)).

"[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)

(alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). "In evaluating whether a trial court abused its discretion, . . .we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Id.* (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Cheripka v. Commonwealth*, 78 Va. App. 480, 494 (2023) (quoting *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020)).

RPD Officer Harrell and his partner were the first responders to the scene of T.H.'s murder, arriving around 7:30 p.m. He saw "a crowd of people around a female [T.H.] who was on the ground on the sidewalk," grabbed a first aid kit, and proceeded to "render aid" in the form of chest compressions. He cut off T.H.'s shirt with his trauma shears to locate her wounds. Photographs which depicted what Officer Harrell saw as he approached T.H. were admitted without objection. The video from his body worn camera was admitted as Commonwealth's Exhibit 2 and was shown to the jury. Henderson's counsel stated, "subject only to our earlier objection," after the video was shown, although the record is unclear what that objection was.

In his appeal brief, Henderson argues that Officer Harrell's body camera video was "highly inflammatory, irrelevant, and more prejudicial than probative" and therefore inadmissible. He highlights the portions of the video which depicted "several onlookers having very emotional responses" and "Officer Harrell performing CPR for 2 to 3 minutes on the unresponsive victim." Henderson contends that the recording "was not relevant to a fact in issue in the case." We do not agree.

Henderson raised the same issue but about a different officer—Officer Triana—in his pre-trial motion *in limine*. After a hearing on June 1, 2023, the trial court took the matters under

advisement.  In its order dated June 7, 2023, the trial court denied Henderson's motion as to Officer Triana but allowed the Commonwealth to play Officer Harrell's body camera footage. The trial court found that the video was prejudicial, but not unfairly so, and that its probative value outweighed the risk of unfair prejudice.  *See* Va. R. Evid. 2:403.  The trial court found that "the video may assist the fact finder on the issues of location, severity of the crime, position of the victim, and other relevant issues" and did not need to be muted.  The trial court's denial of the motion was not an abuse of its discretion.

    4. The record supports the trial court's denial of Henderson's motion *in limine* related to gang evidence.

"Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case."  *Utz v. Commonwealth*, 28 Va. App. 411, 418 (1998) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)).  "Evidence of other crimes, wrongs, or acts is inadmissible if offered merely to show the accused's propensity to commit the crime for which he is charged."  *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022).  But "[s]uch 'prior bad acts' evidence is admissible 'if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.'"  *Id.* (quoting Va. R. Evid. 2:404(b)).  "It is also well established that 'prior bad acts' evidence is admissible 'when it "shows the conduct or attitude of the accused toward his victim[,] [or] establishes the relationship between the parties."'"  *Id.* (first alteration in original) (quoting *Kenner*, 299 Va. at 424).

"Although gang membership alone is not evidence of a defendant's prior bad conduct, a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior."  *Utz*, 28 Va. App. at 420.  As earlier noted, evidence of prior bad conduct is "admissible in certain situations."  *Id.*  Evidence of prior bad

- 18 -

acts "may be properly admitted '. . . to prove motive to commit the crime charged,'" or to "'show the conduct and feeling of the accused toward his victim, or to establish their prior relations.'" *Id.* (quoting *Reynolds v. Commonwealth*, 24 Va. App. 220, 223-24 (1997)). "[T]he test is whether the 'legitimate probative value outweighs the incidental prejudice to the accused.'" *Id.* at 421 (quoting *Reynolds*, 24 Va. App. at 223-24).

Before trial, Henderson argued that evidence of his alleged gang affiliation should be excluded. After reviewing the parties' written motions, responses, and oral argument, the trial court denied the motion, finding that the Commonwealth's evidence of Henderson's gang affiliation was relevant under Virginia Rules of Evidence 2:401 and 2:402, that its probative value was not substantially outweighed by the danger of unfair prejudice or the likelihood of confusing the jury under Rule 2:403, and that it was "admissible for the purposes outlined in Rule [2:]404(b)." We agree.

The proven motive for the shootings was gang related—co-defendant Coley had been in a long-running feud with Logan. Henderson was previously associated with another gang, the 13th, which split with 30 Boyz after an internal feud. Gang detectives testified that Henderson was considered an "associate" of 30 Boyz since T.H.'s murder and through his social media posts. The Commonwealth presented expert testimony that it would be "consistent [with] gang members, one or some [sic] whom have an issue with a person, to join together and commit a violent act like a shooting." Thus, as the detectives explained, it was not uncommon for people affiliated with a gang to participate in a crime even if they had no personal issue with the targeted individual. The St. Luke's apartment complex was a common gang meeting place, and co-defendant Jackson's girlfriend lived there. In addition, Henderson left the apartment complex with two other co-defendants shortly before the murder.

We find that the testimony about gang membership was offered not as propensity evidence but for its legitimate probative value which outweighed the risk of unfair prejudice. *Conley*, 74 Va. App. at 670-71.

5. The trial court appropriately denied Henderson's motion to expand the jury pool.

"The manner in which jury selection is conducted is within the discretion and control of the trial court, guided by statute and rule of court." *Buchanan v. Commonwealth*, 238 Va. 389, 400 (1989); *see* Code § 8.01-358. Code § 19.2-262 establishes that a panel of 12 persons selected from a pool of not less than 20 people is required for a jury in a felony trial. In a joint trial, the statute provides a system of strikes, but does not allow for additional strikes for the defendant. Code § 19.2-262(D). Indeed, "[t]here is no basis in Virginia law for additional peremptory strikes." *Buchanan*, 238 Va. at 405.

In his pre-trial motion to allocate strikes during jury selection, Henderson asked the trial court to expand the jury pool to 24 people so that each party could have 4 preemptory strikes. In denying the motion, the trial court quoted *Brooks v. Commonwealth*, 24 Va. App. 523, 529 (1997), that "[a] trial judge has broad discretion and control over how *voir dire* is conducted and the procedure for seating a jury."

Henderson contends that, since the General Assembly amended Code § 19.2-246 in 2005 and allowed for an expanded jury selection in joint trials, the rule of law established in *Adkins v. Commonwealth*, 24 Va. App. 159 (1997), if not overruled, was outdated. *Adkins* instructed that a jury in a felony prosecution was to number 12 persons selected from a panel of 20. *Id.* at 165. As the *Adkins* Court noted, "[n]othing in the statute or in the United States or Virginia Constitutions assures multiple defendants a specified number of strikes." *Id.* He argues that the trial court should have exercised its discretion under Code § 19.2-246 and expanded the jury pool to 24 members so that each defendant could have 4 strikes each.

Here, in accordance with both statutory and case precedent, the trial court denied Henderson's motion to expand the jury pool and allocate strikes, ruling that "the jury panel SHALL consist of twenty-three potential jurors, which, after preemptory strikes, will yield a final panel of twelve, with three alternates." We see no reason to disturb the trial court's judgment.

6. Whether the trial court properly ruled on opinion evidence on the videos

As Henderson concedes on brief, "The appellant has determined this argument is without merit and abandons this assignment of error." Therefore, we do not consider this assignment of error.

7. The trial court properly admitted Henderson's jail call.

"[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Pulley v. Commonwealth*, 74 Va. App. 104, 118 (2021) (alteration in original) (quoting *Jones v. Commonwealth*, 71 Va. App. 597, 602 (2020)). A trial "court has 'broad discretion' regarding the admission of evidence and . . . any ruling on admissibility will not be overturned absent an 'abuse of discretion.'" *Vera v. Commonwealth*, 77 Va. App. 271, 282 (2023) (quoting *Conley*, 74 Va. App. at 670).

The prosecutor proffered,[19] without objection, that Henderson called Stephens from the jail the day before the trial was to begin. Henderson discussed what his attorney had said about witnesses not appearing and that "he would be good" without the testimony of certain witnesses. Henderson claimed that the call was innocent, in that he did not threaten or coerce Stephens not to appear.

---

[19] The trial court was permitted to rely on the unchallenged proffer of counsel of testimony in deciding the evidentiary issue of admitting the Henderson-Stephens jail call. *See Bloom v. Commonwealth*, 262 Va. 814, 822 (2001).

In exercising its obligation to balance any potential prejudice with "the effectiveness of . . . measures to cure any such risk," the trial court limited the portion of the call to be played to the jury. *See Barnes v. Commonwealth*, 22 Va. App. 406, 412 (1996). It found that the "only portion of the that [sic] contains probative information that is not substantially outweighed by the risk of undue prejudice or other concerns outlined in Rule 2:403" was at "0 minutes and 38 seconds to 2 minutes and 55 seconds" and limited the Commonwealth to playing only that portion for the jury.

8. The evidence supported instructing the jury on the theory of concert of action.

"[C]oncert of action [is] a species of accomplice liability, carrying with it the principle that the punishment imposed on each accomplice may be the same." *Parson v. Commonwealth*, 74 Va. App. 428, 445 n.9 (2022) (alterations in original) (quoting *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 279 (2015)). Under the theory, when conspirators execute a plan to commit a specific offense and one of the conspirators commits another crime in the process, all conspirators are criminally liable for that crime—even if unintended—provided it was an "incidental probable consequence" of their plan's execution. *Thomas v. Commonwealth*, 279 Va. 131, 157 (2010) (quoting *Brown v. Commonwealth*, 130 Va. 733, 738 (1921)). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" *Parson*, 74 Va. App. at 445 n.9 (alteration in original) (quoting *Hampton v. Commonwealth*, 34 Va. App. 412, 418 (2001)). The theory of concert of action is a variation on the natural and probable consequences doctrine—all participants in the action are treated the same even if only one participant caused the ultimate harm. "In effect, the participant who does not cause the ultimate harm is a principal in the second degree to the participant who does cause that harm." Roger D. Groot, *Criminal Offenses and Defenses in Virginia* 91 (4th ed. Supp. 2002).

"Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). The appellate court reviews jury instructions "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Payne* v. *Commonwealth*, 292 Va. 855, 869 (2016) (quoting *Lawlor*, 285 Va. at 228).

Henderson contends that the Commonwealth's jury instruction regarding concert of action was an incorrect statement of the law of this case. He argues that the proper statement of the law was principal in the second degree—that the principal must do some overt action to assist the principal and must share in the principal's intent—for each defendant. Henderson's instruction favored establishing individual culpability, which the evidence did not support. As the Commonwealth argued, the jury should determine whether the defendants acted in concert based on the evidence, rather than if each defendant was a principal in the second degree.

The Commonwealth's concert of action instruction was accurate and supported by the evidence. Two cars, carrying five people, were tracked by cellular data and video from a known gang location to Gilpin Court. Eyewitnesses testified that they saw individuals in the vehicles pull out guns and start shooting. Video caught muzzle bursts from the passenger side of one car. There was a barrage of gunfire from the cars as they drove through the intersection shooting at Logan. The forensic investigator recovered more than 20 cartridge cases of different calibers in and around the murder scene. There was "more than a scintilla" of evidence that Henderson was in concert of action with others in T.H.'s murder and Logan's attempted murder. *Hampton*, 34 Va. App. at 417. We view the evidence in the "light most favorable to the party offering the instruction," here the Commonwealth. *Id.* at 418. We find that the "law [was] clearly stated and that the instructions cover[ed] all issues which the evidence fairly raise[d]." *Fahringer v.*

- 23 -

*Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)).  We find the trial court did not err in instructing the jury on concert of action.

II.  The evidence was sufficient to prove Henderson's guilt on all charges.

An appellate court reviews a lower court's findings of fact "with the highest degree of appellate deference."  *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Barney*, 302 Va. at 96).  "[T]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).  Thus, when reviewing whether the evidence was sufficient to convict a defendant of a criminal offense, an appellate court has a "limited" role, and "'[t]he only "relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'"  *Id.* (alterations in original) (quoting *Barney*, 302 Va. at 97).

"It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'"  *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor*, 294 Va. at 512).  "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty."  *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

Here, the evidence was sufficient that Henderson and his co-actors were present and responsible for T.H.'s murder.  The surveillance videos and license plate readers show Henderson and his co-actors at St. Luke's apartment complex and then leaving in a black

Hyundai. Their cellular phones tracked together to another meeting place—the BP station—just before traveling to North 1st Street in the Gilpin Court area. The two cars were videoed and tracked coming through the intersection, pausing, then leaving at the time of T.H.'s murder. Henderson and some of the co-actors' cell phones continued to track together to Uptown Alley, where they arrived shortly after the murder and stayed until later that night. The shell casings found by the forensic investigator in the intersection were fired from the same guns and were consistent with the ammunition found in the magazines discovered in the BMW. The caliber of the bullets lodged in Logan's car were consistent with the casings in the intersection and near T.H.'s body. The casings found further away from her body were different from those in the intersection. Eyewitnesses described at least one of the men in the cars as wearing a ski mask— two ski masks were found in the BMW. Eyewitnesses saw the men in the Hyundai and the BMW pull out guns and start shooting in the direction of Logan's car. Simply put, upon the evidence, a reasonable finder of fact could conclude beyond a reasonable doubt that Henderson or his co-actors fired the shot that murdered T.H. and that Henderson was guilty of the charged offenses.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed. The matter is remanded to the trial court for the limited purpose of correcting a scrivener's error in the final order, as noted above.

*Affirmed and remanded*